*Broadway Services, Inc. v. Comptroller of Maryland*, No. 19, September Term, 2021. Opinion by Getty, C.J.

**PRINCIPAL-AGENT RELATIONSHIP — IMPLIED AGENCY RELATIONSHIPS**

The Court of Appeals held that the Maryland Tax Court incorrectly applied the implied agency factors and therefore erroneously concluded that Broadway Services, Inc. was exempt from paying sales tax on purchases of cleaning supplies for Johns Hopkins Hospital, Johns Hopkins Bayview Hospital, and Howard County General Hospital where Broadway Services, Inc. acted as an agent of the hospitals.

**ADMINISTRATIVE LAW AND PROCEDURE — JUDICIAL REVIEW**

The Court of Appeals held that issues not encompassed in an agency's final decision, here *John McShain v. Comptroller*, 202 Md. 68 (1953), and Md. Code (1988, 2016 Repl. Vol., 2020 Supp.), Tax-General Article § 11-204, could not serve as a basis to review the agency's decision.

Circuit Court for Anne Arundel County
Case No. C-02-CV-18-000554
Argued: November 1, 2021

IN THE COURT OF APPEALS

OF MARYLAND

No. 19

September Term, 2021

_____

BROADWAY SERVICES, INC.

v.

COMPTROLLER OF MARYLAND

_____

Getty, C.J.
*McDonald,
Watts,
Hotten,
Booth,
Biran,
Wilner, Alan M.
   (Senior Judge, Specially Assigned)

JJ.

_____

Opinion by Getty, C.J.

_____

Filed: April 1, 2022

*McDonald, J., now a Senior Judge, participated in the hearing and conference of this case while an active member of this Court. After being recalled pursuant to Md. Const., Art. IV, § 3A, he also participated in the decision and adoption of this opinion.

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

The case before us involves contracts between three non-profit tax-exempt hospitals of the Johns Hopkins Health System ("JHHS"), and Broadway Services, Inc. ("Broadway"), a for-profit business. Under the contracts, Broadway provided management services to the hospitals, including purchasing and providing cleaning supplies for use by the hospitals' janitorial staff. Broadway paid sales and use tax on these purchases.

The Comptroller of Maryland ("Comptroller") is responsible for the fair and efficient collection of taxes. To aid in performing the principal duty of collecting taxes, the Comptroller conducts audits, assesses taxes, and considers applications for tax refunds. The Comptroller audited Broadway, and Broadway filed a request for an offset and refund of the taxes it paid to cleaning supply vendors, asserting that Broadway was reselling the cleaning supplies and was therefore exempt from paying sales and use tax. The Comptroller denied Broadway's requested refund and assessed additional unpaid taxes discovered from the audit.

Broadway appealed the Comptroller's decision to the Maryland Tax Court ("Tax Court"). The Tax Court reversed the Comptroller's denial of Broadway's requested offset and refund and held that Broadway was not a reseller but, because it acted as the hospitals' agent, should not have been charged sales tax.

The Tax-General Article of the Annotated Code of Maryland states that, except as otherwise provided, a sales and use tax is imposed on "a retail sale in the State[,] and . . . a use, in the State, of tangible personal property, a digital code, a digital product, or a taxable service." Md. Code (1988, 2016 Repl. Vol., 2020 Supp.), Tax-General Article ("TG") §§ 11-102(a) *et seq.* A retail sale includes the sale of "(i) tangible personal property; (ii) a

taxable service; (iii) a digital code; or (iv) a digital product." TG § 11-101(h)(1). However, a retail sale does not include "a sale of tangible personal property . . . if the buyer intends to . . . resell the tangible personal property . . . in the form that the buyer receives or is to receive the property[.]" TG § 11-101(h)(3)(ii)(1). Tangible personal property is defined as "(i) corporeal personal property of any nature; (ii) an accommodation; or (iii) a short-term rental." TG § 11-101(k)(1).

Exemptions to the sales and use tax are located in Title 11, Subtitle 2 of the Tax-General Article. Section 11-204(a)(3) identifies an exemption to sales and use tax for certain nonprofit organizations and states in pertinent part:

(a) The sales and use tax does not apply to:

***

(3) a sale to a nonprofit organization made to carry on its work, if the organization:

(i) 1. is located in the State;

***

(ii) is a charitable, educational, or religious organization;

(iii) is not the United States; and

(iv) except for the American National Red Cross, is not a unit or instrumentality of the United States[.]

TG § 11-204(a)(3).

To qualify as an organization exempt from sales and use tax under TG § 11-204(a)(3), "the organization shall file an application for an exemption certificate with the Comptroller." TG § 11-204(c). Buyers are required to produce evidence showing

2

exempt status from sales and use tax, and must "provide[] the vendor with: (1) evidence that the buyer has an exemption certificate; or (2) the evidence that the Comptroller requires by regulation." TG § 11-408(a). The vendor's duty to collect sales and use tax from a buyer is "waived if the buyer provides the vendor with a signed resale certificate that" complies with the standards set forth in TG § 11-408(b)(1).

The question before us is whether the Tax Court erred in concluding that Broadway should not have been charged sales tax on the purchases. Further, we consider whether our holding in *John McShain v. Comptroller* supports a conclusion that Broadway should not have been charged sales tax. 202 Md. 68 (1953). For the reasons explained below, we answer that the Tax Court erred in concluding that Broadway acted as an agent of the hospitals when it purchased cleaning supplies. We also decline to extend our narrow holding in *McShain* to the present circumstances because the cleaning supplies were not incorporated into the realty of the hospitals.

## BACKGROUND

### A. *Factual Background*

Broadway is a for-profit company that provides security, parking, housekeeping, transportation, and facilities and property management services. Broadway is a subsidiary of the DOME Corporation, which is equally owned by The Johns Hopkins University and the JHHS. Between 1994 and 2001, Broadway entered into written Hospital Service Agreements ("HSA") with Johns Hopkins Hospital, Johns Hopkins Bayview Hospital, and Howard County General Hospital (collectively, the "hospitals"). The hospitals are exempt from sales and use tax as non-profit organizations.

3

Each hospital entered into its own HSA with Broadway, but the contracting procedures were uniform, and the HSAs themselves were largely similar. To create the HSAs, Broadway "mimicked" similar contracts from its competitors. The HSAs did not reference the creation of an express agency relationship.

Under the HSAs, Broadway provided janitorial management, including furnishing cleaning supplies to the hospitals, managing overall operations, and supervising janitorial staff. Specifically, Broadway "provid[ed] housekeeping services to [the hospitals] in accordance with the terms and conditions" of the HSAs. These services explicitly included "provid[ing] cleaning supplies and equipment to [the hospitals'] personnel performing housekeeping duties in and about the facility." Third-party vendors assessed sales tax on Broadway's purchases of cleaning supplies, which Broadway paid. The vendors shipped the cleaning supplies directly to the hospitals for use by the hospitals' janitorial staff. The hospitals required the cleaning supplies to comply with infectious control standards. Before Broadway altered its purchases, Broadway presented the products to the hospitals for approval under their infectious control standards for hospital use.

Broadway's personnel did not clean the hospitals. At each hospital, the janitorial staff was unionized and prohibited non-union individuals and entities from cleaning. However, Broadway supervised the cleaning operations, inspected the work done by janitorial staff, and ensured the janitorial staff correctly completed the work Broadway assigned.

The hospitals compensated Broadway in twelve monthly installments based on an agreed-upon annual price. The HSAs provided that "[a]t the beginning of each month

4

during the term of [the HSAs,]" Broadway "shall submit to [the hospitals] an invoice covering" one-twelfth of the lump-sum amount. The HSAs and monthly invoices did not contain an itemized breakdown of the costs, such as the specific costs of the cleaning supplies or of Broadway's management expenses. The payments were not adjusted based on the actual costs incurred. Instead, any additional expenses above the agreed-upon annual rate factored into the following year's calculation.

Adjustments to the annual rate required an agreement between both parties. Amendments to the HSAs did not take effect unless the parties agreed to written amendments. On one occasion, Broadway and one of the hospitals agreed to amend the HSA to change the rate before the end of the contract term. This amendment was necessary because one of the hospitals added two new towers, which caused Broadway to incur additional expenses, including the costs of purchasing larger quantities of cleaning supplies to account for the expansion.

This case arises from a sales tax audit of Broadway conducted by the Comptroller between December 1, 2007 and November 30, 2011. Broadway responded to the audit with a request for an offset credit and refund of $76,161.96, which equals the amount of sales tax Broadway paid. In its request, Broadway contended that it paid excess tax for services and products purchased for resale to the hospitals. The Comptroller denied Broadway's refund request and further assessed an additional $9,073.93 in unpaid sales and use tax.

5

## B.     *Procedural Background*

Broadway appealed to the Tax Court and asserted that it purchased supplies for resale to three tax-exempt hospitals under TG § 11-101(h)(3)(ii)(1).  The Comptroller moved for summary judgment and argued that (1) Broadway was not a reseller; and (2) Broadway was not an agent of the hospitals when it purchased the cleaning supplies.  In its response, Broadway stated that the Comptroller "provide[d] absolutely no background or authority to explain how [the agency argument was] even relevant to the matter before the [Tax Court]."  The Tax Court denied the Comptroller's motion for summary judgment and held an evidentiary hearing on the matter.

After a one-day hearing, the Tax Court ruled, without explanation, that Broadway's purchases did not satisfy the reseller exemption.  The Tax Court did not directly mention *McShain*, but counsel for Broadway briefly mentioned the case in closing argument.  The Tax Court stated, "I'm going to suggest that these items were – I'm not going to call them resold to [the hospitals]."[1]  However, the Tax Court conducted an agency analysis on the record and found that Broadway purchased supplies as an agent of the hospitals and should not have been charged sales tax.  The Tax Court noted that "no written document [made] Broadway the agent of [the hospitals] for the purchase of these supplies" but found an implied agency relationship existed between Broadway and the hospitals, exempting Broadway from paying sales and use tax.

---

[1] The Tax Court made oral findings of fact and conclusions of law on the record.  In doing so, instead of referring to the hospitals separately, "for lack of a burden," the Tax Court identified the parties as "Hopkins" and "Broadway."

6

The Comptroller appealed the Tax Court's decision to the Circuit Court for Baltimore County, and that court transferred the matter to the Circuit Court for Anne Arundel County. The Circuit Court for Anne Arundel County affirmed the Tax Court's decision. In an opinion dated March 31, 2021, the Court of Special Appeals reversed the circuit court. *Comptroller v. Broadway Servs., Inc.*, 250 Md. App. 102, 109 (2021).

Broadway petitioned for a writ of *certiorari*, which we granted on July 9, 2021. *Broadway Servs., Inc. v. Comptroller*, 475 Md. 2 (2021). The question before us is whether the Tax Court erred in concluding that Broadway should not have paid sales and use tax on the cleaning supplies because Broadway was an agent of the hospitals. Further, we consider whether our holding in *McShain* provides grounds to conclude that Broadway should not have paid sales and use tax on the purchases.

## STANDARD OF REVIEW

The Tax Court is an administrative agency of the State. TG § 3-102; *F.D.R. Srour P'ship v. Montgomery Cty.*, 407 Md. 233, 243 (2009). The Tax Court consists of five judges who have jurisdiction to hear appeals of final decisions relating to tax issues. TG § 3-103(a); TG § 3-106(a). Matters within the Tax Court's jurisdiction include: "(1) the valuation, assessment, or classification of property; (2) the imposition of a tax; (3) the determination of a claim for refund; (4) the application for an abatement, reduction, or revision of any assessment or tax; or (5) the application for an exemption from any assessment or tax." TG § 3-103(a). Judicial review of Tax Court decisions is subject to the same standards used to review other agency decisions. TG § 13-532(a)(1); *Comptroller*

7

*v. Wynne*, 431 Md. 147, 160 (2013), *aff'd*, 575 U.S. 542 (2015); *see also* Md. Code (1984, 2021 Repl. Vol.) State Government II Article § 10-222.

When reviewing decisions of an administrative agency, this Court does not review the decisions of the circuit court or the Court of Special Appeals. *Frederick Classical Charter Sch., Inc. v. Frederick Cty. Bd. of Educ.*, 454 Md. 330, 369 (2017); *Spencer v. Md. State Bd. of Pharmacy*, 380 Md. 515, 523–24 (2004). Instead, this Court considers whether the administrative agency itself erred. *Frederick Classical Charter Sch., Inc.*, 454 Md. at 369. This Court should not "make independent findings of fact or substitute its judgment for that of the agency[,]" but may determine whether the administrative agency made an error of law. *Couret-Rios v. Fire & Police Emps.' Ret. Sys. of City of Balt.*, 468 Md. 508, 528 (2020) (quoting *Md.-Nat'l Cap. Park & Plan. Comm'n v. Anderson*, 395 Md. 172, 180–81 (2006)). This Court will review an agency's decision "solely on the grounds relied upon by the agency." *Dep't of Health & Mental Hygiene v. Campbell*, 364 Md. 108, 123 (2001) ("[T]he reviewing court, restricted to the record made before the administrative agency, . . . may not pass upon issues presented to it for the first time on judicial review and that are not encompassed in the final decision of the administrative agency.").

When the administrative agency's decision is based on factual findings, this Court may not reverse the agency if substantial evidence supports the agency's decision. *Ramsay, Scarlett & Co., Inc. v. Comptroller*, 302 Md. 825, 834 (1985). Substantial evidence exists if "a reasonable mind might accept [the evidence] as adequate to support a conclusion." *Id.* This Court views the agency's decision in the light most favorable to the agency and

trusts the agency's resolution of "conflicting evidence" and inferences drawn therefrom. *Id.* at 835.

An administrative agency's legal conclusions are given deference to the extent that they are "premised upon an interpretation of the statutes that the agency administers and the regulations promulgated for that purpose." *Frey v. Comptroller*, 422 Md. 111, 138 (2011) (citing *People's Couns. for Balt. Cty. v. Surina*, 400 Md. 662, 682 (2007)). However, where an agency's decision is based on the "application and analysis of case law," the decision encompasses a "purely legal issue uniquely within the ken of a reviewing court." *Id.* (quoting *People's Couns. for Balt. Cty. v. Loyola Coll.*, 406 Md. 54, 67–68 (2008)). Therefore, unless the agency's conclusion of law is a "purely legal issue uniquely within the ken" of the agency's expertise and experience, we review the conclusion *de novo* for correctness because "it is always within our prerogative to determine whether an agency's conclusions of law are correct, and to remedy them if wrong." *Id.* at 67; *Schwartz v. Md. Dep't Nat. Res.*, 385 Md. 534, 554 (2005) (citations omitted).

When determining if tax exemptions apply, we do not presume that the State surrendered its taxing power. *Ballard v. Supervisor of Assessments of Balt. Cty.,* 269 Md. 397, 403 (1973). Therefore, we strictly construe tax exemptions against the taxpayer. *Supervisor of Assessments of Balt. Cty. v. Trs. of Bosley Methodist Church Graveyard*, 293 Md. 208, 212 (1982).

## DISCUSSION

### A.    *Agency Analysis*

The Tax Court concluded that Broadway's purchases of supplies were exempt from the sales and use tax on a theory that Broadway was an implied agent of tax-exempt organizations—the hospitals.  The Tax Court did not cite any specific exemption related to agency or any other legal authority to support that theory.  We strongly doubt that an agent of a tax-exempt organization—other than one who makes purchases directly for the organization and presents the organization's exemption certificate for that purpose—is exempt from the sales and use tax merely on the basis of an agency relationship.  Nevertheless, we will review the Tax Court's agency analysis.

An overview of the law of agency is helpful before reviewing the Tax Court's agency analysis.  An agency relationship is fiduciary in nature, and its creation "turns on the parties' intentions as manifested by their agreements or actions." *Green v. H&R Block, Inc.*, 355 Md. 488, 503 (1999).  This Court has previously identified "two fundamental elements for the creation of [an] agency relationship[.]" *Id.* at 505 (quoting W. Edward Sell, Sell on Agency § 7, at 7 (1975)).  First, there must be "some manifestation or indication by the principal to the agent that he [or she] consents to the agent's acting for his [or her] benefit[.]" *Id.*  Second, there must be "consent by the agent to act for the principal." *Id.*  Ultimately, the reviewing court must determine whether the parties

10

intended to enter into an agency relationship. *Anderson v. Gen. Cas. Ins. Co.*, 402 Md. 236, 247 (2007).

Even though the creation of an agency relationship requires consent from both the principal and the agent, the relationship may be created expressly or implicitly. *Green*, 355 Md. at 503. Absent a written agreement, courts consider the following three factors, derived from the Restatement (Second) of Agency ("Restatement"), to determine if an agency relationship exists: (1) the agent's power to alter the legal relations of the principal; (2) the agent's duty to act primarily for the benefit of the principal; and (3) the principal's right to control the agent. *Id.* (citing Restatement, §§ 12–14 (Am. L. Inst. 1958)). These three factors are neither exclusive nor conclusive considerations in determining whether an agency relationship exists, and they should be viewed "within the context of the entire circumstances of the transaction or relations." *Id.* at 506. When a party asserts an agency relationship through inference, that party bears the burden of proving the existence of the agency relationship, including its nature and extent. *Id.* at 504.

Broadway argues that the Tax Court's decision is supported by substantial evidence. Specifically, Broadway asserts that a reasonable mind might come to the same conclusion as the Tax Court by relying on the following facts from the testimony presented at the hearing: Broadway purchased the cleaning supplies used by the hospitals' janitorial staff, the cleaning supplies were shipped directly to the hospitals, JHHS owns Broadway and the hospitals, Broadway was paid in twelve monthly installments, and JHHS had to approve each cleaning product to ensure it met the appropriate standards.

11

The Comptroller argues that the Tax Court's agency decision is not based on substantial evidence. First, the Comptroller asserts that the record before the Tax Court lacked evidence that Broadway and the hospitals manifested an intent for Broadway to act as the hospitals' agent. Second, relying on the three factors used to consider whether an agency relationship exists absent express intent, the Comptroller contends that Broadway could not alter the hospitals' legal relations, Broadway did not act subject to the hospitals' control, and Broadway did not act for the benefit of the hospitals based on the HSAs' compensation provisions.

General agency principles are not within the Tax Court's ambit. Therefore, we will review the Tax Court's agency analysis *de novo* but continue to give deference to the Tax Court's factual findings while conducting our review. *Ramsay, Scarlett & Co., Inc.*, 302 Md. at 834; *Schwartz*, 385 Md. at 554.

Broadway's and the Comptroller's reliance on the three factors of implied agency supports a conclusion that neither party believed there was an express agency relationship between Broadway and the hospitals. The Tax Court found that "no written document [made] Broadway the agent of [the hospitals] for the purchase of these supplies." Although the Tax Court did not closely examine the HSAs to ascertain the contracting parties' intent, the HSAs do not demonstrate an intent to create an express agency relationship. The Court of Special Appeals below noted that the Tax Court "should have examined the contracts to determine the nature of the relationship they established[,]" but ultimately concluded that the HSAs appear to establish "arms-length relationships between Broadway and the hospitals." *Broadway Servs., Inc.*, 250 Md. App. at 120. We agree.

12

Testimony before the Tax Court shows that Broadway obtained a similar contract from its competitors and "mimicked" it when entering into agreements with the hospitals. It follows that the HSAs between Broadway and each of the hospitals read similarly, aside from information relevant to one particular hospital, but not the others (such as the hospital's address and the annual price owed to Broadway for its services). The common provisions of the HSAs set out the parties' expectations, including outlining Broadway's responsibilities, clarifying items for which Broadway would not provide, and identifying the manner and amount of Broadway's compensation. The HSAs lack express language indicating that the hospitals intended to create an agency relationship with Broadway. Thus, if an agency relationship existed between Broadway and the hospitals, it must have been an implicit relationship discerned by consideration of the three agency factors that courts use to determine whether parties' conduct or acquiescence amounts to an agency relationship.

### 1. *The Agent's Power to Alter the Legal Relations of the Principal*

The first factor to consider is the agent's power to alter the legal relations of the principal. This factor represents an integral component of agency relationships—an agent's power to act on the principal's behalf in third-party interactions. *Walton v. Mariner Health of Md., Inc.*, 391 Md. 643, 655 (2006). Prior cases demonstrate an emphasis on legal relations with third parties, not between the parties themselves. *Id.* ("An agent has the authority to enter into a contract on behalf of that principal."); *Strawn v. Jones*, 264 Md. 95, 98 (1972) ("It is well established law that an agent can enter into a contractual relationship with a third party to the extent of the agent's prescribed authority."); *Daskais*

13

*v. Kline*, 188 Md. 541, 552 (1947) (holding the principal was bound by an offer made by the agent to a third party regarding an estate settlement).

According to the Restatement, an agent's ability to alter the principal's legal relations may include the agent entering into binding contracts with third parties on the principal's behalf, subjecting the principal to tort liability, or acquiring or divesting the principal of assets. Restatement, § 12 cmt. a. The Restatement also provides guidance regarding an agent's power to alter the principal's legal relations, emphasizing that an agent "has power to affect the legal relations of the principal to the same extent as if the principal had so acted." *Id.*

In assessing Broadway's power to alter the hospitals' legal relations, the Tax Court stated,

> I don't see that there were any alterations in terms of the chemicals in any given year. [The hospitals] told them what to buy, and those are the ones that they purchased. There was some testimony that mid-year, at least once, the contract was re-negotiated because the contract amount wasn't enough. [The hospitals] added a building or two, and the contract – they were running out of money. They didn't have enough money to cover it, so [the hospitals] made an amendment to the contract; that if they had too much money, which didn't seem to happen, there was sort of an agreement that the next year they would make it up by charging less. But I didn't hear any testimony that ever happened.

The Tax Court's analysis of the first factor erroneously focuses on the legal relationship between Broadway and the hospitals rather than addressing whether Broadway could alter the hospitals' legal relations with third parties. The Tax Court's conclusion relating to the first factor is unclear, but no matter the outcome, the circumstances that the Tax Court relied upon are inconsequential in determining whether Broadway could enter

14

into binding agreements on the hospitals' behalf, subject the hospitals to tort liability, or acquire and divest the hospitals' interests. *See* Restatement, § 12 cmt. a.

Instead, the Tax Court's analysis is at odds with general agency principles, which include the agent's power to alter the legal relations of the principal within the scope of the agency relationship. No evidence presented before the Tax Court shows that Broadway could have entered into contracts on the hospitals' behalf. Nor was there evidence presented that shows that the hospitals would be directly liable to the cleaning supply vendors had Broadway failed to pay the amounts owed. In fact, the evidence shows that Broadway calculated its anticipated expenses, including the price of the cleaning supplies, management services, and other costs associated with managing the hospitals. The evidence shows that, had Broadway miscalculated the annual cost, Broadway would have suffered a loss and factored it into the next year's HSA.

Additionally, the Tax Court's analysis appears factually inconsistent with the provisions of the HSAs and the testimony provided. The Tax Court's analysis of the first factor suggests that Broadway had authority to alter the HSAs without the hospitals' consent. Broadway could only amend the contract under severe circumstances with the hospitals' consent if the parties agreed to an amendment in writing and acknowledged by signature. Each of the HSAs include provisions titled "Miscellaneous" that provide, among other things, that "[n]o amendment to this Agreement shall be effective unless in writing and signed by the parties hereto." Further, testimony showed that Broadway and one hospital amended an HSA when the hospital added new buildings that could not be factored

15

into the initial budget.[2]  Otherwise, the difference in cost would have been factored into the

next year's annual payment.  Witness testimony and the language of the HSAs demonstrate

---

[2] Regarding the amendment, the following discourse occurred between the Tax Court and a witness for Broadway:

> THE COURT: Did you ever find that their supplies are – you're using too much supplies?
>
> THE WITNESS: Usually it's the other way around.
>
> THE COURT: You have stuff left over?
>
> THE WITNESS: No, we have to order more.
>
> THE COURT: That's what I mean.
>
> THE WITNESS: Oh, yes, yes.  That happened when they opened the two new towers down there.  We put a budget together and –
>
> THE COURT: Did they give you an amendment to the budget because –
>
> THE WITNESS: Absolutely because we would have been out of – the amount we were consuming on these new towers was a lot more than budgeted.  We had to go back to them –
>
> THE COURT: The reason for that was because you now had a new building?
>
> THE WITNESS: Right.
>
> THE COURT: But otherwise during the year if you estimate wrong its on you?
>
> THE WITNESS: We go back the next year and adjust it.  We have gone back –
>
> THE COURT: During that year – are you – during the year if you find out we're using twice as much stuff, supplies as we thought we were going to?
>
> THE WITNESS: The only time that happened is when the new towers open[ed] and we had to meet with that.

that Broadway could not even alter its own legal relations with the hospitals, absent consent to do so.

The Tax Court erred as a matter of law regarding the first agency factor because it considered Broadway's relationship with the hospitals rather than Broadway's ability to alter the hospitals' legal relations with third parties. We determine that the first agency factor does not support the existence of an agency relationship between Broadway and the hospitals because Broadway's purchases did not directly bind the hospitals, and no evidence presented shows that Broadway could have otherwise altered the hospitals' legal relations.

### 2. *The Agent's Duty to Act Primarily for the Benefit of the Principal*

The second factor to consider is the agent's duty to act primarily for the benefit of the principal. Section 13 of the Restatement—"Agent as a Fiduciary"—states that the creation of an agency relationship causes the agent "to be a fiduciary, that is, a person having a duty, created by his [or her] undertaking, to act primarily for the benefit of another in matters connected with his [or her] undertaking." Acting primarily for the benefit of the principal includes: (1) the agent's duty to "account for profits arising out of the employment"; (2) "the duty not to act as, or on account of, an adverse party without the principal's consent"; (3) "the duty to not compete with the principal on his [or her] own account or for another in matters relating to the subject matter of the agency"; and (4) "the

17

duty to deal fairly with the principal in all transactions between them." Restatement, § 13 cmt. a.

This Court has also addressed this factor. In *Green*, we reiterated the universal agency principle that "the powers of the agent are to be exercised for the benefit of the principal *only, and not of the agent or of third parties*." 355 Md. at 517 (quoting *King v. Bankerd*, 303 Md. 98, 108 (1985)) (emphasis in original). We further emphasized that the "fundamental duties of an agent are loyalty to the interest of his [or her] principal and the need to avoid any conflict between that interest and his [or her] own self-interest." *Id.* at 517–18 (quoting *C-E-I-R, Inc. v. Comput. Dynamics Corp.*, 229 Md. 357, 366 (1962)). The Tax Court stated the following:

> Benefit of the principal. Well, purchase of these supplies certainly were [for] the benefit of the hospital. They told them what to buy, and those were the items that were purchased. There was a question about who did the ordering. Well, that was again to the benefit of the hospital. The supervisors on-site were the ones who directly could see what supplies were running low and needed to be order[ed] and when to reorder them. There's no reason that the hospital couldn't have done it except they didn't have employees that were there. Or if they did, they were the actual workers and not the ones they trusted to make these kinds of decisions.

The Tax Court's analysis of the second agency factor is erroneous as a matter of law because it fails to focus on the agent's duty to act primarily for the benefit of the principal. Instead, the Tax Court analyzes this factor through the common understanding of "benefit" rather than addressing whether Broadway had a legal duty to act primarily for the benefit of the hospitals.

By focusing on whether the hospitals benefitted in the general sense of the word, the Tax Court failed to consider this factor through the lens of the legal framework

18

established in case law and explained in the Restatement. The Tax Court failed to analyze whether Broadway had a duty to place the hospitals' interests above its own when providing cleaning supplies and management services to the hospitals.

The Tax Court's mistake is illustrated in its emphasis on the common understanding of benefit, acknowledging that the hospitals benefitted by allowing Broadway's qualified personnel to order and maintain stock of the cleaning supplies. Further, the testimony before the Tax Court provides no basis to conclude that Broadway owed the hospitals a duty to put the hospitals' interests before its own, avoid conflicts between Broadway's interests and the hospitals' interests, or fairly deal in transactions between the hospitals and Broadway.

Despite the existence of a contractual relationship between the hospitals and Broadway, which is established through the HSAs, this relationship does not create an agency relationship. The compensation method outlined in the HSAs could provide Broadway with an opportunity to put its interests before the hospitals' interests. Under the HSAs, the lump-sum annual amount was due in twelve monthly installments, and the price the hospitals paid did not change based on the actual cost of the cleaning supplies. So long as Broadway complied with the contractual requirements for the cleaning supplies, Broadway was free to choose which cleaning supplies it provided to the hospitals. Presumably, several brands of cleaning supplies carry products that are compliant with the hospitals' infectious control standards. When presenting a product for compliance with infectious control standards, Broadway would be within its rights to consider its own interests when choosing a product. For example, Broadway could propose an item from a

particular brand that would strengthen Broadway's professional relationships or increase Broadway's yearly profits by selecting materials that would increase Broadway's profit margins.

Additionally, the manner in which Broadway is compensated does not require Broadway to prioritize the hospitals' financial interests. Theoretically, as long as Broadway does not suffer a loss itself, Broadway does not have an incentive to consider the hospitals' financial interests when deciding what cleaning supplies to provide to the hospitals' janitorial staff. For example, if two brands offer cleaning supplies that are compliant with the hospitals' standards, and one brand is more expensive than the other, but Broadway is still being adequately compensated, Broadway would be free to choose the more expensive brand despite there being a less expensive compliant product, which disregards the hospitals' financial interests. Each of these scenarios, which are both compliant with the HSAs, show that Broadway did not owe a legal duty to act primarily for the benefit of the hospitals.

Therefore, the Tax Court erred in its analysis of the second agency factor because it failed to consider whether Broadway had a duty to act primarily for the benefit of the hospitals. There is not substantial evidence of record to demonstrate that Broadway owed any such duty. We determine that the second agency factor does not support the conclusion that an agency relationship existed between Broadway and the hospitals.

### 3. *The Principal's Right to Control the Agent*

The third factor to consider is the principal's right to control the agent. In *Green*, we stated that the principal's right to control the agent need not be physical control. 355

Md. at 508. Instead, "the agent must be subject to the principal's control over the result or ultimate objectives of the agency relationship." *Id.* We further explained that the control a principal exercises over its agent "is not defined rigidly to mean control over the minutia of the agent's actions, such as the agent's physical conduct[.]" *Id.* at 510. Ultimately, the principal must have the "responsibility to control the end result of his or her agent's actions[.]" *Id.*

We emphasized in *Green* that the level of control required to establish an employer-employee relationship—one kind of agency relationship—is greater than the level of control required for other types of agency relationships. In *Green*, to ascertain the level of control necessary to establish a principal-agent relationship, we used the degree of control required to establish an employer-employee relationship as guidance. 355 Md. at 508. We clarified that all employers are principals, and all employees are agents, but "only when the level of control is sufficiently high" does an employer-employee relationship attach. *Id.* at 510.

In *Chevron, U.S.A., Inc. v. Lesch*, we also explained that "[o]ne may be an agent of another, owing to his [or her] principal the fiduciary obligations of loyalty and general obedience, but at the same time not be sufficiently under the control of the principal to be considered [an employee]." 319 Md. 25, 32 (1990).

The Tax Court did not consider this factor separately. At best, the Tax Court addressed control when it noted that the hospitals "told [Broadway] what to buy, and those were the items that were purchased." However, the Tax Court's finding that the hospitals controlled the purchases is not entirely correct based on testimony from a witness for

21

Broadway, who stated that the hospitals approve "what increase we're getting for wages and to the extent we even order supplies. If we were to change a supply we're ordering, we have to go to [the hospitals'] infectious control [standards unit] and they have to approve it to be an approved product to be used in hospitals."

The Tax Court erred when considering this factor. Assuming the Tax Court intended its brief comment that the hospitals told Broadway what to buy to be an analysis of this factor, that comment is inconsistent with the testimony that was before the court. According to the testimony of Broadway's witness, the hospitals did not tell Broadway which cleaning supplies to purchase. Instead, Broadway ordered standard cleaning supplies, and in the event the standard order changed, the hospitals reviewed the cleaning supplies to ensure they were compliant with infectious control standards. This collaborative approval process does not equate to the principal's control over the agent's actions.

In *Brooks v. Euclid Systems Corporation*, the Court of Special Appeals considered an appeal from Richard E. Brooks against Euclid Systems Corporation ("Euclid") and other securities issuers involved in the case. 151 Md. App. 487, 494 (2003), *cert. denied*, 377 Md. 276 (2003). Mr. Brooks, through his investment and financial advisor, Michael P. Keating, invested some of his accumulated retirement savings. *Id.* at 493. Eventually, Mr. Brooks learned that Mr. Keating materially misrepresented the nature and suitability of the investments. *Id.* Instead of investing Mr. Brooks' resources into low-risk investments, Mr. Keating invested in high-risk securities. *Id.* at 493–94. Mr. Brooks lost all of his retirement savings and sued Mr. Keating; Mr. Keating's employer, Delta Equity Services

22

Corporation ("Delta"); and the companies that issued the securities, including Euclid. *Id.* at 494. Euclid and the other issuers moved for summary judgment, which the Circuit Court for Baltimore County granted. *Id.* Mr. Brooks appealed that decision and asserted that the jury should decide whether Mr. Keating, through his status as an employee of Delta, was an agent of the issuers. *Id.*

With respect to control, Mr. Brooks argued that the Selling Agreement executed between the parties permitted an inference that Delta and Mr. Keating were Euclid's agents. *Brooks*, 151 Md. App. at 508. The Selling Agreement stated that

> Delta could only offer and sell the securities to investors who met the financial suitability and other offeree standards set forth in the [Offering Memo]; Delta was prohibited from advertising the availability of securities by way of newspaper, television or media; Delta could only present prospective investors with written materials previously approved by [Euclid]; Delta was required to present prospective investors with the [Offering Memo] prior to sale; Delta was required to collect the Investor Subscription Documents and funds from prospective investors and forward them to [Euclid]; and Delta was required to ensure that the information contained on the subscription documents was accurate.

*Id.*

The Court of Special Appeals held that the Selling Agreement did not give Euclid the right to control Delta's conduct because the control "merely required Delta and its agents to comply with either preferred practices in the private placement industry or applicable securities laws." *Brooks*, 151 Md. App. at 509. Therefore, in *Brooks*, this factor weighed against finding that an agency relationship existed because Euclid did not have the requisite level of control over Delta's conduct. *Id.*

23

In the present case, the facts show that the hospitals approved the cleaning supplies for compliance with infectious control standards. Ensuring compliance with appropriate standards is similar to requiring compliance with "preferred practices in the private placement industry or applicable securities laws." *Brooks*, 151 Md. App. at 509. Following the analysis in *Brooks*, the hospitals did not exercise sufficient control over Broadway because their control was limited to ensuring compliance with infectious control standards. Broadway could have presented any compliant cleaning supplies to the hospitals for approval, and theoretically, the hospitals would have approved any compliant product. This factor also weighs against finding that an agency relationship existed between the hospitals and Broadway.

In sum, the Tax Court erred in deciding that Broadway, acting as an agent to the hospitals, should not have been charged sales and use tax. The Tax Court erroneously applied each of the three agency factors and therefore incorrectly concluded that Broadway acted as an agent of the hospitals. Accordingly, we reverse the Tax Court's decision.

Although the Tax Court erred in its agency analysis in the present case, we emphasize that an agency relationship alone is insufficient for the agent to claim the principal's tax-exempt status. For a tax-exemption to apply, the underlying act performed by the agent must still fit within an exemption set forth in the Maryland Code, and the parties to the agency relationship must comply with the procedures and requirements set forth in the Maryland Code when claiming a tax exemption.

24

*B.*     **McShain** *and TG § 11-204 Analysis*

Before turning to the parties' substantive arguments relating to *McShain*, we must determine whether the issue of the applicability of our holding in *McShain* is properly before us as a procedural matter. We determine that, because *McShain* is not "[a] ground[] relied upon" or an issue "encompassed in the final decision" of the Tax Court, it is not a basis upon which we can affirm the Tax Court's decision. *Campbell*, 364 Md. at 123. However, reaching the issue is in the interest of judicial efficiency,[3] and we hold that neither *McShain* nor TG § 11-204 provides a basis to conclude that Broadway's cleaning supplies purchases should have been exempt from sales and use tax.

In *McShain*, this Court held that building materials, purchased by an intermediary contractor for use in constructing a building for a tax-exempt entity, were exempt from sales and use tax because the building materials were incorporated into the realty of the final physical structure, and the exemption at issue emphasized the use of the property and not the exemption status of the user. 202 Md. at 74.

Judicial review of agency decisions differs slightly from judicial review of trial court judgments. Generally, we restrict our review to the basis on which the administrative

---

[3] Maryland Rule 8-131(a) provides us with discretion to consider issues that are not properly before us. It states:

> Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but *the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal*.

Md. Rule 8-131(a) (emphasis added).

25

agency decided the case. *Campbell*, 364 Md. at 123. Expanding on that principle, we have explained that appellate review of a trial court judgment may result in "search[ing] the record for evidence to support the judgment" and "sustain[ing] the judgment for a reason plainly appearing before the record whether or not the reason was expressly relied upon by the trial court." *United Steelworkers of Am. AFL-CIO, Loc. 2610 v. Bethlehem Steel Corp.*, 298 Md. 665, 679 (1984). However, the reviewing court "may not uphold the agency order unless it is sustainable on the agency's findings and for the reasons stated by the agency." *Id.* (citations omitted).

Although it appears that counsel for Broadway briefly addressed this Court's decision in *McShain* in his closing argument before the Tax Court, the Tax Court's oral findings of fact and conclusions do not appear to be based on the *McShain* holding. Counsel for Broadway stated,

> The nonprofit exemption has been found to extend to agents of exempt entities. Early, one of the first sales tax cases period was John [McShain] v. Comptroller, 1953 from the Court of Appeals. And that said it would be a strained interpretation of the charitable nonprofit exemption to say that someone would be entitled to the exemption when they purchased directly from the supplier and not when they [acquire] the property from an intermediary.

The transcript shows that the Tax Court, without citing to the reseller exemption directly, dismisses the applicability of the exemption by noting that the Comptroller "was complaining [that Broadway] talked about agency . . . awfully late in the game. But, [from] my perspective it seems to be the only thing that make[s] sense." After considering each agency factor separately, the Tax Court continued, "[i]t's not a clear-cut decision, . . . . But I'm going to suggest that these items were – I'm not going to call them resold to [the

26

hospitals]. They were purchased as agents for [the hospitals] for the benefit of [the hospitals] so that they should not have been charged sales tax."

The Tax Court's findings are devoid of direct analysis and conclusions pertaining to the reseller exemption and clearly demonstrate that, from the Tax Court's perspective, the agency theory was the only viable theory to support refunding the sales tax Broadway paid for its cleaning supplies purchases. Under this Court's general method of reviewing agency decisions, we cannot affirm the Tax Court's decision on *McShain* grounds because the Tax Court did not rely on *McShain* to reach its conclusion. We decline to substitute our own judgment for that of the Tax Court, especially regarding the applicability of the reseller exemption, which is within the Tax Court's ambit and therefore entitled to deference. *Frey*, 422 Md. at 138.

In *McShain*, this Court considered the applicability of the sales and use tax exemption to a contractor's purchase of supplies and materials incorporated into buildings for use by the National Institute of Health ("NIH") located in Bethesda, Maryland. 202 Md. at 70. Between August 1935 and March 1942, two Montgomery County residents, Mr. and Mrs. Wilson, donated land in Bethesda to the United States for the construction of buildings for use by the NIH. *Id.* The donations were properly accepted, and the federal government acquired adjoining land for the building. *Id.*

In 1949, John McShain, a builder, entered into a lump-sum contract with the United States, through the Public Buildings Administration, to build a clinical building on the land. *McShain*, 202 Md. at 70–71. The Comptroller demanded Mr. McShain pay sales and use tax on the materials and supplies that were incorporated into the building and refused to

27

grant a refund of taxes paid.  *Id.*  Mr. McShain argued his purchases were exempt from the sales and use tax under various sections of Article 81—the prior codification of the Tax-General Article—and Rule 70, which was promulgated by the Comptroller on June 1, 1949.  *Id.* at 71.

Ultimately, this Court held that Mr. McShain was not responsible for paying sales and use tax on the building materials he purchased.  *McShain*, 202 Md. at 74.  The Court reasoned that the NIH could fairly be deemed exempt from the sales and use tax based on its purpose and further noted that a purchase of tangible personal property incorporated into the building could be considered "for use in carrying on the work" of the tax-exempt institution or organization—here, the NIH.  *Id.* at 72.  Holding to the contrary would be a "strained construction" because tax-exempt organizations and institutions would be "entitled to the exemption when they purchase directly from a supplier, but not when they acquire the property through an intermediary contractor."  *Id.* at 73.

Broadway argues that this Court should extend its holding in *McShain* to apply to its purchase of cleaning supplies for the tax-exempt hospitals.  In doing so, Broadway compares its purchases of cleaning supplies to Mr. McShain's purchases of building materials to construct the NIH building.  According to Broadway, failing to extend *McShain* to this case would result in an anomaly—a tax exemption for one form of tangible personal property (construction materials) but not for another (cleaning supplies).

The Comptroller responds by citing three cases in which this Court refused to extend the *McShain* holding and urges this Court to adopt a similar approach in this case.  In each

of the cases, the purchases made relative to a tax-exempt entity were not incorporated into the realty of the non-profit organization, and this Court declined to extend *McShain*.

In *Comptroller v. Joseph F. Hughes & Company, Inc.*, the Comptroller assessed John F. Hughes & Company sales tax on items purchased by the company, including "(1) lumber used for forms in connection with the laying of concrete[;] (2) nails and hardware used in the form lumber[;] (3) muriatic acid used to clean bricks[;] (4) fuel for temporary heating[;] (5) photographs showing the progress of the work[; and] (6) special bits for small tools." 209 Md. 141, 143 (1956). Each of the purchases fulfilled contracts with Baltimore City and other political subdivisions of the State, and the parties stipulated that the "value of all the items was destroyed by the use made of them in the progress of the work." *Id.* The Court held that the items were subject to sales tax because *McShain*'s holding interpreted a statute limited to property purchased for specified uses. *Id.* at 145. Therefore, this Court declined to extend *McShain* to a contractor's purchases of "an expendable or operating item" when the contractor used the items and destroyed their value "before they came into the use of the landowner, and neither title nor possession ever passed to the political subdivisions." *Id.* at 146.

In *Steiner Construction Company, Inc. v. Comptroller*, the Court was presented another opportunity to consider *McShain* in the context of purchases made under contracts to maintain, improve, and repair property owned by the Baltimore & Ohio Railroad Company. 209 Md. 453, 456 (1956). This Court considered whether Steiner Construction Company owed sales tax on its purchases of personal property used in forty-seven contracts between the construction company and the Baltimore & Ohio Railroad Company. *Id.*

29

Under the contracts, the construction company made alterations, improvements, and repairs to real property owned by the railroad.  *Id.*  The *Steiner* Court emphasized that the holding in *McShain* is limited to scenarios where the exemption is tied to the owner's use and not the owner's exemption status.  *Id.* at 461.

Finally, in *James McHugh Construction Company v. Comptroller*, a dispute involved the Washington Metropolitan Area Transit Authority ("WMATA") Compact, in which Maryland, Virginia, and the District of Columbia established a common agency to alleviate transit and traffic concerns in the metropolitan area.  291 Md. 48, 49–50 (1981). The Compact stated that WMATA was not required to pay taxes upon any property acquired by it but allowed the signatory states the power to collect taxes upon "material, equipment, or supplies purchased by any company subject to the Compact[.]"  *Id.* at 50.  In 1974, James McHugh Construction Company entered into a contract with WMATA to construct a portion of a subway system in Bethesda, Maryland and paid sales tax on the materials incorporated into the subway structure.  *Id.* at 52.

The construction company filed refund requests in the amount of the paid sales tax. *James McHugh Constr. Co.*, 291 Md. at 52.  The Comptroller denied the refund requests, and the Tax Court and Circuit Court for Montgomery County affirmed.  *Id.*  This Court affirmed the courts below.  *Id.*  Again, this Court declined to extend *McShain* and held that *McShain* did not govern because a "contractor's exemption depends upon the use to which the property is put and not upon the tax-exempt status of the user."  *Id.* at 56.

As we did in those three cases, we decline to extend *McShain* to the circumstances of this case.  Although at first glance, there appears to be similarities between *McShain* and

30

the facts at hand, those similarities do not withstand scrutiny. Those similarities include: (1) that the contract in *McShain* and the HSAs before us in this case were for lump-sum amounts; (2) that the contracts in both cases were between intermediary purchasers and tax-exempt organizations; and (3) that the intermediary purchasers were charged sales tax on the purchases and disputed the taxes.

However, relying solely on these similarities ignores a key difference between the facts of *McShain* and the facts before us. In *McShain*, the building materials purchased were incorporated into the NIH building's final physical structure, unlike the cleaning supplies in this case. Even if the cleaning supplies were for use in carrying on the hospitals' work, the cleaning supplies are not incorporated into the realty of the hospitals. Thus, Broadway's argument that holding in favor of the Comptroller would result in inconsistent tax exemptions without meaningful difference lacks merit.

For the reasons above, we decline to extend *McShain* and hold that *McShain* does not provide a basis for Broadway's purchases to be exempt from sales tax.

## CONCLUSION

For the foregoing reasons, we hold that the Tax Court erroneously conducted its agency analysis as a matter of law. Additionally, we hold that *McShain* cannot serve as a proper basis to affirm the Tax Court because the Tax Court's decision was based on agency principles and not on Broadway's theory of the reseller exemption or this Court's holding in *McShain*. Even if the *McShain* arguments were properly before us, we would not affirm on those grounds because our holding in *McShain* is narrow and does not extend to purchases of tangible personal property when the items are not incorporated into the realty

31

of the tax-exempt organization.  Accordingly, we affirm the judgment of the Court of

Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**