*Arthur Becker, et al. v. Falls Road Community Association, et al.*, No. 24, September Term, 2021.  Opinion by Getty, C.J.

**ADMINISTRATIVE LAW AND PROCEDURE — COLLATERAL ESTOPPEL — APPLICABILITY AND RECORD EVIDENCE**

The Court of Appeals held that the Board of Appeals of Baltimore County erred in reversing an administrative law judge's conclusion that collateral estoppel did not bar the approval of an updated development plan where the record contained competent, material, and substantial evidence that established material changes existed between the original development plan and the updated development plan.

Circuit Court for Baltimore County
Case No. C-03-CV-19-002639
Argued: December 03, 2021

IN THE COURT OF APPEALS

OF MARYLAND

No. 24

September Term, 2021

ARTHUR BECKER, ET AL.

v.

FALLS ROAD COMMUNITY
ASSOCIATION, ET AL.

*Getty, C.J.
*McDonald,
Watts,
Hotten,
Booth,
Biran,
Gould,

JJ.

Opinion by Getty, C.J.
McDonald and Watts, JJ., concur and dissent.
Hotten, J., dissents.

Filed: August 26, 2022

*Getty, C.J., and McDonald, J., now Senior Judges,
participated in the hearing and conference of this
case while active members of this Court. After being
recalled pursuant to Md. Const., Art. IV, § 3A, they
also participated in the decision and adoption of this
opinion.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

The case before us involves a family-owned one-hundred-acre tract of land in northern Baltimore County that the property owner, in connection with a Maryland-based development firm, seeks to develop. The local community association and neighboring residents have opposed the proposed development for multiple reasons, generally based upon traffic safety concerns. The dispute between the property owner and the local community association has spanned the better portion of the last two decades and has endured countless procedural obstacles including a restructuring of Baltimore County's oversight process for development and zoning matters. The property owner finally received approval to develop the remaining "northern pod" of the property in 2019, which led to the present appeal.

This Court is asked to determine whether the Board of Appeals of Baltimore County erred in reversing an administrative law judge's determination that substantial changes existed between an original development plan and a later proposed development plan, and therefore the doctrine of collateral estoppel did not bar approval of the later proposed development plan. For the following reasons, we answer that question in the affirmative and reverse the judgment of the Court of Special Appeals.

## BACKGROUND

The present dispute between Arthur Becker, Nancy Miller, and Gaylord Brooks Realty (collectively, "Becker") and the Falls Road Community Association ("Community Association") has spanned nearly the entirety of the last two decades. The factual background and procedural history relevant to this appeal are outlined in detail below.

*A.*    *The 2004 Development Plan*

For more than 75 years, the Becker family has owned an approximately one-hundred-acre tract of land in northern Baltimore County where they live and operate a commercial fruit orchard. The land is bisected east to west by Beaverdam Run, which is a tributary that flows into the Loch Raven Reservoir. The tract of land is therefore divided into a "southern pod" and a "northern pod" by Beaverdam Run.

Becker initially sought permission from Baltimore County ("County") to construct twenty single-family dwellings on the one-hundred-acre property ("2004 Development Plan"). The Community Association opposed the 2004 Development Plan, citing concerns about traffic safety, adequacy of well and septic systems, and suitability of storm water management systems. Deputy Zoning Commissioner John Murphy ("Commissioner Murphy") held a public hearing on the matter beginning on January 29, 2004, which lasted five days. Multiple witnesses provided testimony, including Becker, County officials, civil engineers, an ecologist, and two traffic engineers: John Seitz, on behalf of the Community Association, and Wesley Guckert, on behalf of Becker.

One of the critical issues pertaining to the approval of the 2004 Development Plan involved access onto Falls Road/Maryland Route 25, a State highway. Access is ultimately controlled by the State Highway Administration ("SHA"), which is charged with analyzing safety issues and determining whether access will be permitted for the proposed

development, and if so, what improvements are required to obtain access. *See* Maryland

Code of Regulations 11.04.05.01(A).[1]

On March 6, 2003—following its review of the concept plan Becker submitted prior

to the submission of the 2004 Development Plan to the County—the SHA issued a letter

to Becker refusing to permit access to Falls Road for the proposed development, stating:

> We have reviewed the referenced concept plan and do not recommend
> approval. The proposed entrance is located on a sub-standard section of MD
> 25.

> *       *       *

> We would strongly recommend that the developer evaluate alternate
> access to MD 25, such as, Applecroft Lane due to the existing road
> conditions.

The record before Commissioner Murphy included this letter from the SHA.

In addition to this letter from the SHA, Commissioner Murphy also considered the

testimony of the two traffic engineers, both of whom relied on the American Association

of State Highway Transportation Officials ("AASHTO") standards for evaluating the

impact on the traffic traveling on Falls Road from the northern pod. The development of

the northern pod proposed ten new lots that would be accessible through the frontage on

Falls Road, which consisted of a one-hundred-foot strip of land. The 2004 Development

Plan called for a public road, proposed as Rose Court, to service these ten lots and the

---

[1] The County also regulates the safety of the proposed development's road system under Section 34-4-405(a) of the Baltimore County Code, which requires that a proposed development have "safe and convenient vehicular circulation," but the ultimate determination of permissibility of access onto a State highway is made by the SHA.

3

pre-existing Becker home. Mr. Seitz and Mr. Guckert reached conflicting conclusions as to the impact the development of the northern pod would have on Falls Road.

Mr. Seitz testified that drivers coming from Rose Court and attempting to get onto Falls Road would not have the adequate space to reach a safe speed to merge with drivers that were traveling at or above the posted speed limit of forty miles-per-hour on Falls Road. He explained that traffic engineers typically use two different measurements of the distance that a driver would need to avoid a collision. The first measurement is referred to as "stopping sight distance," which is the safe stopping distance for drivers who unexpectedly encounter something on the roadway. Mr. Seitz provided an example of "a child wandering out into the roadway or a disabled vehicle in the road over the crest of a hill." The second measurement is referred to as "intersection sight distance," which refers to the distance a driver needs to merge from a minor road into traffic on a major road. In his explanation, Mr. Seitz emphasized that this calculation "includes the time it takes the vehicle pulling out to accelerate to [a] safe speed."

Mr. Seitz, using the AASHTO calculation tables, calculated the stopping sight distance at 305 feet and the intersection sight distance at 445 feet. He testified that the intersection sight distance for drivers coming from Rose Court and entering Falls Road created a safety hazard for drivers on Falls Road approaching from the south. Mr. Guckert agreed that 305 feet is the stopping sight distance specified by AASHTO for a forty miles-per-hour road. However, he noted that vehicles traveling northbound on Falls Road climb a six percent grade hill near the intersection with Rose Court, which reduces the stopping sight distance from 305 feet to 278 feet. With this understanding, Mr. Guckert

4

characterized this as an adequate stopping sight distance. While Mr. Guckert agreed with

Mr. Seitz that the intersection sight distance did not satisfy AASHTO's safety standards, it

was his opinion that the proper consideration in this matter is the lesser standard of stopping

sight distance. In support of this contention, Mr. Guckert emphasized that the number of

drivers coming from Rose Court would be relatively low as the development would only

have ten homes. He noted "that had this development been a [300-dwelling] proposal, he

may have chosen the higher standard."

Both Mr. Seitz and Mr. Guckert identified additional safety concerns with the

development of the northern pod. The first safety concern focused on Hickory Hill Road—

a county road on the opposite side of Falls Road from the northern pod—because it did not

align with the new intersection of Rose Court. Put differently, Hickory Hill Road and Rose

Court would not directly face one another. Mr. Seitz and Mr. Guckert agreed that it would

be best to "align the new road with Hickory Hill Road from a safety standpoint." The two

further agreed that if it became impossible to align these roads that the "next best design"

would be to have the new and existing roadways one hundred feet apart.

On March 12, 2004, Commissioner Murphy issued a written opinion that approved

the development of the southern pod but denied the development of the northern pod.[2]

---

[2]  Following the issuance of Commissioner Murphy's March 12, 2004 opinion, Becker
filed a motion for reconsideration seeking relief only as to the southern pod, which did not
require direct access onto Falls Road. On December 11, 2006, Commissioner Murphy
approved Becker's revisions to the southern pod. However, the Community Association,
along with other protestants, expressed concern that granting this motion for
reconsideration might be interpreted as vacating Commissioner Murphy's prior decision
regarding the northern pod. If so, this would permit Becker to develop the northern pod
without adhering to the conclusions and recommendations Commissioner Murphy set forth

5

Commissioner Murphy observed that Becker "own[ed] only approximately one hundred feet of frontage on the west side of Falls Road[,]" which "severely limited" where any road intersecting Falls Road from the northern pod could be located. Commissioner Murphy credited both Mr. Seitz's and Mr. Guckert's testimony in ultimately determining that cars entering Falls Road from the northern pod would not have adequate sight distance. Commissioner Murphy noted a combination of factors that created an unsafe situation at the intersection of Falls Road and Rose Court. He provided the following illustration to demonstrate these concerns:

> On a workday morning, drivers are coming out of Applecroft Lane, Rose Court, Hickory Hill Road and the Jones driveway to get onto Falls Road to go to work or school. Traffic is flowing both ways on Falls Road and as shown by the traffic data a significant portion of this traffic exceeds the 40 mph speed limit. The vehicle coming from Applecroft wants to turn right to go toward Rose Court. The vehicle on Rose Court wants to turn left to go north on Falls Road. The vehicle on Hickory Hill wants to go north on Falls Road. And last, but certainly not least, Mrs. Jones wants to go north on Falls Road. All traffic from these side roads stops waiting for a break in Falls Road traffic. Their attention is riveted on Falls Road traffic. When a break comes in the flow of traffic, who goes first?

Commissioner Murphy continued with this illustration, predicting that drivers would become "frustrated by having to wait for Falls Road traffic coming out of Applecroft, Rose Court, Hickory Hill and the Jones driveway in a mad and dangerous scramble to accelerate onto Falls Road. They are not going to be looking for traffic coming from the other side roads." Accordingly, Commissioner Murphy, based on the cumulative

---

in his opinion. To avoid this misinterpretation, Commissioner Murphy explicitly established in his 2006 opinion that the granting of the motion for reconsideration had no impact on the 2004 findings regarding the northern pod and the traffic concerns of the access to Falls Road. Becker developed the southern pod following this approval.

weight of the evidence, deemed the proposed intersection unsafe, and denied the development of the northern pod.

In his conclusion, Commissioner Murphy stated that he "cannot provide some exact criteria under which [he would] approve the northern pod[,]" but he did provide "some general concepts" to improve the 2004 Development Plan. Commissioner Murphy suggested that Rose Court should not be a public road and that the number of lots should be reduced to allow for the use of a private driveway. Additionally, Commissioner Murphy stated that he would allow the developer to submit revised designs that provide a safe intersection of any driveway, which serves the northern pod and Falls Road, and revised storm water management system.

**B.** *The 2016 Development Plan*

Approximately ten years later, Becker submitted revisions to the 2004 Development Plan to address the prior denial of developing the northern pod ("2016 Development Plan"). The only relevant change from the 2004 Development Plan to the 2016 Development Plan was a reduction in the number of lots from ten to eight. The proposed access point on Falls Road remained a public road and still did not align with Hickory Hill Road. Significantly, however, contrary to its position on the 2004 Development Plan, the SHA *approved* the proposed access point onto Falls Road and correspondingly recommended approval of the 2016 Development Plan. In doing so, the SHA specifically addressed site distance and found that the 2016 Development Plan demonstrated compliance with the applicable regulations governing site distance.

7

Due to restructuring of County government, Administrative Law Judge John Beverungen ("ALJ") presided over hearings on this matter, instead of a Deputy Zoning Commissioner, on December 17, 2015, May 16, 2016, and June 24, 2016.[3] Representatives from the County's Department of Permits, Approvals and Inspections, the Department of Environmental Protection and Sustainability, and the Department of Planning provided testimony recommending approval of the 2016 Development Plan. Additionally, two traffic engineers, one on Becker's behalf and one on the Community Association's behalf, presented expert testimony. On August 5, 2016, the ALJ issued a written opinion that denied approval of the 2016 Development Plan, concluding that the doctrine of collateral estoppel barred its approval.

The ALJ focused on Commissioner Murphy's 2004 and 2006 rulings and highlighted that Commissioner Murphy "cited three reasons for his decision: (1) inadequate intersection sight distance; (2) the proposed access road was not aligned with Hickory Hill Road; and (3) the proposed access road was designated as a public road." The ALJ's

---

[3] In 2011, the County Council approved two bills that restructured the County's executive branch of government. On December 6, 2010, Bills 122-10 and 123-10 were introduced at a County Council meeting, which collectively "propose[d] a few substantive changes to the organizational structure of the County's executive branch of government[.]" Both bills received favorable votes at the County Council meeting on January 3, 2011, and the restructuring took effect on January 16, 2011. Within this restructuring, the Baltimore County Office of Administrative Hearings ("OAH") assumed the duties of the Zoning Commissioner and Deputy Zoning Commissioner. The OAH is a quasi-judicial body comprised of administrative law judges who hear cases and issue decisions on a variety of matters, including, zoning, land use, and related topics. The administrative law judges are appointed by the County Executive and then confirmed by the County Council. *See* Baltimore County Government, Office of Administrative Hearings https://www.baltimorecountymd.gov/departments/adminhearings/ [https://perma.cc/WD5C-SYQL].

analysis continued to explain that even "[t]hough these findings were initially stricken in response to [Becker's] Motion for Reconsideration, [Commissioner] Murphy again emphasized in a 2006 Order that the factual findings and legal conclusions set forth in his 2004 Order would be applicable to any future development of the northern pod[.]"

The ALJ found that the 2016 Development Plan retained two significant, unchanged features from the 2004 Development Plan: (1) it designated Peachwood Lane, formerly called Rose Court, as a public road; and (2) the proposed access to Falls Road did not align with Hickory Hill Road. Additionally, the ALJ credited the testimony of the two traffic experts that the 2016 Development Plan still did not satisfy the AASHTO intersection sight distance standard. The ALJ underscored that "[t]his was also the case when [Commissioner] Murphy issued his Order in 2006 withholding the approval of the northern pod[.]" Accordingly, the ALJ concluded that these unchanged factors that carried over from the 2004 Development Plan stand "as an obstacle to the approval" of the 2016 Development Plan.

The ALJ's analysis initially focused on the doctrine of res judicata, but aptly observed that "the more appropriate terminology is collateral estoppel[.]" He stated that, for the 2016 Development Plan to evade the applicability of collateral estoppel, substantial changes must be made for the development plan to be considered "distinct" from the 2004 Development Plan. The ALJ found that the only "salient difference" between the 2004 Development Plan and the 2016 Development Plan "is that the current proposal is for 8 rather than 10 lots." As such, the ALJ concluded that collateral estoppel barred the approval of the 2016 Development Plan.

9

*C.*     *The 2018 Development Plan*

Becker submitted a modification to the 2016 Development Plan in 2018 ("2018 Development Plan"). The 2018 Development Plan altered the 2016 Development Plan in two principal ways. First, the 2018 Development Plan reduced the number of lots from eight to five. Second, it changed the access road onto Falls Road from a public roadway to a private driveway. The ALJ that denied approval of the 2016 Development Plan also considered the 2018 Development Plan. After receiving evidence and testimony, the ALJ determined that substantial changes existed between the 2004 Development Plan and the 2018 Development Plan, and that therefore, collateral estoppel did not bar consideration of the 2018 Development Plan. The ALJ issued a written opinion on February 6, 2019, this time approving the development of the northern pod set forth in the 2018 Development Plan.

In connection with the review of the 2018 Development Plan, County agency representatives from the Department of Permits, Approvals and Inspections, Development Plans Review, and the Office of Zoning Review attended the public hearing before the ALJ. Each County agency representative indicated that the 2018 Development Plan addressed all comments submitted by their respective agency, and thus each County agency representative recommended approval of the 2018 Development Plan.

As to the proposed access point on Falls Road, the County agencies' "highway comments" stated:

> Falls Road, Maryland Route 25, is a state road. All improvements, intersections, entrances, draining requirements and construction affecting a state right-of-way are subject to the standards, specifications and approval of

10

the *Maryland State Highway Administration* in addition to those of Baltimore County.

(Emphasis added).

In addition, the County agencies specified certain improvements that the County required Becker to construct at the proposed access point on Falls Road. A letter from the SHA was admitted into evidence that accepted the private driveway access onto Falls Road contingent upon certain conditions being met during the County's final approval of the 2018 Development Plan.

Becker also presented one witness at the hearing, Joshua T. Sharon, a professional engineer with Morris & Richie Associates, Inc. Mr. Sharon provided expert testimony detailing the alterations in the 2018 Development Plan. Mr. Sharon described what he determined to be "significant" changes between the 2004 Development Plan and the 2018 Development Plan.

Notably, the Community Association did not present any witnesses or evidence to rebut the County agencies' comments, the SHA's approval of the Falls Road and Peachwood Lane intersection, or Mr. Sharon's testimony regarding the "significant" changes in the 2018 Development Plan. Members of the community only provided testimony highlighting their various concerns, which focused generally on traffic safety.

After considering all the evidence and testimony, the ALJ issued an eight-page opinion approving the 2018 Development Plan. Following a summary of the evidence and testimony in the record, the ALJ first addressed the legal issue of the applicability of the

11

doctrine of collateral estoppel.[4]  The ALJ emphasized that collateral estoppel does not apply if the "applicant can show there has been a 'substantial change in fact and circumstances.'"  He identified the "50% reduction in density" from the 2004 Development Plan as a substantial change.  In addition, he identified the change in designation of the access roadway from a public roadway to a private driveway as a substantial change.  The ALJ explained that Commissioner Murphy "referenced both of these issues in his 2004 order when discussing the circumstances under which the 'northern pod' might be approved, and thus he obviously considered these to be material or substantial issues."  In concluding that collateral estoppel did not bar approval of the 2018 Development Plan, the ALJ further maintained that "[t]hese changes are more numerous and substantial than the sole change proposed in the 2016 case; i.e., eight (8) rather than ten (10) lots." (Emphasis omitted).

Finally, the ALJ acknowledged the Community Association's contention "that to avoid the application of [collateral estoppel] the 'change in circumstances must be a change in the particular circumstances that induced the prior denial.'"  The ALJ concluded that Becker satisfied this standard, as Commissioner Murphy noted that for an updated development plan to be approved "the number of lots should be reduced" and "the access road should be private, so drivers are not [misled]."  The ALJ concluded that the 2018

_____

[4]  While the ALJ concluded that collateral estoppel barred approval of the 2016 Development Plan, his analysis regarding the 2018 Development Plan referenced both res judicata and collateral estoppel.  As set forth more fully *infra*, this case only concerns the applicability of the doctrine of collateral estoppel.

12

Development Plan "addresse[d] and propose[d] changes in all of these areas, which 'induced the prior denial.'"

After concluding that collateral estoppel did not bar consideration of the 2018 Development Plan, the ALJ proceeded to consider the merits of the 2018 Development Plan and whether it complied with the applicable development regulations.

With respect to the Community Association's concerns about the safety of the access point at Falls Road, the ALJ made the following findings and conclusions:

> Protestants contend that the County's Plan Review Policy Manual requires public or private intersections to be separate by at least 100 feet. In fact, the Manual states that the distance should be 100 feet "where possible." Here, as recognized by [Commissioner] Murphy, the 100 ft. separation is not possible since the Developer does not own sufficient road frontage on Falls Road. Even so, as recognized by Protestants[,] the centerline of proposed Peachwood [Lane] is approximately 50 feet from the centerline of Hickory Hill Road, which is an increase from the 38 feet of separation shown on the earlier plans. In addition, the [SHA] determined (with regard to the 2016 plan) that the "minimum required site distance can be achieved at the entrance location MD 25 [sic][.]" It is the SHA, not the ALJ or Baltimore County, which determines whether the proposed access is safe and satisfies State requirements, and thus I do not believe the plan can be denied on this basis.

(Internal references to exhibits omitted).

Further, the ALJ stated the following regarding the 2018 Development Plan generally:

> The [Baltimore County Code] provides that the "Hearing Officer shall grant approval of a development plan that complies with these development regulations and applicable policies, rules and regulations." [Baltimore County Code] § 32-4-229. After considering the testimony and evidence presented by the Developer, the exhibits offered at the hearing, and confirmation from the various County agencies that the Plan satisfies those agencies' requirements, I find that the Developer satisfied its burden of proof and, therefore, is entitled to approval of the Development Plan.

13

Accordingly, the ALJ approved the 2018 Development Plan, deferring to the SHA's approval of the Falls Road and Peachwood Lane intersection and concluding that the 2018 Development Plan complied with the applicable development regulations.

**D.** ***Community Association Appeal to the Board of Appeals of Baltimore County***

The Community Association appealed the ALJ's approval of the 2018 Development Plan to the Board of Appeals of Baltimore County ("Board"). Following a hearing on the record, the Board issued a written opinion on July 8, 2019, concluding that "[the ALJ] erred as a matter of law in ruling that the recent development plan modification was not barred by collateral estoppel."

The Board observed, in a footnote, that the ALJ's analysis regarding the 2016 Development Plan began with citations to res judicata, but "ultimately concluded, probably correctly, that the real doctrine that controls is that of collateral estoppel." In doing so, the Board highlighted that "[i]t is sometimes difficult to distinguish between" the two doctrines. Accordingly, the Board's analysis focused on whether the ALJ erred in the application of collateral estoppel, and not the doctrine of res judicata, to the 2018 Development Plan. The sole issue the Board examined was "whether there [had] been a substantial change in circumstances between Deputy Zoning Commissioner Murphy's findings in 2004 that the proposed intersection was unsafe and [the ALJ']s decision in 2019 that it was safe."

The Board outlined Commissioner Murphy's findings and conclusions from 2004 and 2006, as well as the ALJ's conclusions regarding the 2016 Development Plan and the

14

2018 Development Plan. The Board described Commissioner Murphy's "primary safety concern as the ability of the drivers entering Falls Road to see the oncoming traffic, particularly the traffic entering from the proposed Rose Court." The Board summarized that Commissioner Murphy's determination of the proposed intersection as unsafe was

> based on the failure to meet the [intersection sight distance] standard, the sheer number of roads and driveways for traffic seeking to enter Falls Road, all within several hundred feet of each other, the misalignment of Hickory Hill and Rose Court, and the fact that Rose Court, as a public road, potentially created confusion in the minds of the Rose Court vehicles, all of whose drivers expecting the normal safety features of an intersection between two public roads.

The Board determined that safety concerns for drivers on these roadways and intersections substantially influenced Commissioner Murphy's overall decision.

In reviewing the ALJ's approval of the 2018 Development Plan, the Board noted that the ALJ determined that "Commissioner Murphy's safety findings no longer had preclusive effect because the reduction of houses to five and making Peachwood Lane private constituted 'material changes[.]'" The Board ultimately disagreed with the ALJ's conclusion that these two alterations constituted substantial changes from the prior development plans. The Board observed that Becker did not present any "expert testimony from any traffic expert or otherwise as to **why** the reduction to five houses made an unsafe intersection safe." (Emphasis in original). Additionally, the Board emphasized that Becker did not present any testimony, expert or otherwise, explaining why changing Peachwood Lane from a public roadway to a private driveway "materially enhanced the safety of the intersection." The Board determined that Becker insufficiently attempted to bring the 2018 Development Plan within the parameters of Commissioner Murphy's "2004 musings," as

15

"[t]he question of material change in circumstances is an **objective** question to be decided based on the present facts and circumstances." (Emphasis in original). Accordingly, the Board concluded that the record contained no such evidence to render Commissioner Murphy's factual findings regarding the 2004 Development Plan immaterial.

Further, the Board expressed its view that the SHA letters in the record go "from being unable to recommend the intersection in 2004 to having no particular recommendation though accepting the developer's representation that Peachwood Lane could be installed with adequate sight parameters." The Board also emphasized that no witness from the SHA provided testimony at any of the hearings taking place from 2004 through 2018 and that the letters contain various "ambiguities and uncertainties that cannot be blithely overlooked." As such, the Board determined that the position of the SHA could not "represent a material change in the objective safety circumstances as found by Deputy Zoning Commissioner Murphy."

Ultimately, two of the three members of the Board determined that Becker did not present a substantial change "in the circumstances such that the otherwise desirable principal of litigation finality can be over-ridden." The Board concluded that the changes made in the 2018 Development Plan simply harkened "back to Deputy Zoning Commissioner Murphy's fifteen-year-old 'general comments.'"

In a written opinion, the dissenting member of the Board disagreed with the majority's conclusion that "collateral estoppel precludes Developer from moving forward to develop the northern pod of this property in the manner proposed." Although the dissent determined that the doctrine of collateral estoppel did not apply, the dissent would have

16

"remand[ed] this case to amplify the underlying factual basis for the ALJ's approval, particularly as to the safety issues, and if determined to be necessary, to supplement the evidentiary record on those issues." In sum, the Board voted two-to-one to reject the approval of the 2018 Development Plan, thus reversing the ALJ's decision.

## E. Becker's Appeal to the Circuit Court for Baltimore County

Becker sought judicial review of the Board's decision in the Circuit Court for Baltimore County. Following a hearing on the matter, the circuit court issued an opinion from the bench reversing the Board's decision on June 30, 2020. In delivering its ruling, the circuit court recounted the relevant factual background and procedural history. The circuit court explained that its role in reviewing the decision of an administrative agency is limited to determine whether there is substantial evidence in the record to support the agency's findings and conclusions, and to determine if the decision is premised upon an erroneous conclusion of the law.

The circuit court ultimately concluded that the Board "misapplied the law and misconstrued the facts" in reversing the decision of the ALJ. In support of this conclusion, the circuit court stated that "[c]ollateral estoppel cannot apply in this case where prior rulings arise from an entirely different development than the one more recently proposed in 2018." The circuit court continued to explain that the 2018 Development Plan contained material differences, and "there was evidence, substantial evidence, from which the ALJ could have and, in fact, did reach that conclusion[.]" In support of its conclusion the circuit court highlighted that the ALJ appropriately credited Mr. Sharon's "uncontradicted" testimony that the 2018 Development Plan contained material differences compared to the

17

2004 Development Plan. The circuit court issued an order consistent with its holding on July 6, 2020, which reversed the Board's decision, and therefore approved the 2018 Development Plan.

### F. *Community Association Appeal to the Court of Special Appeals*

The Community Association filed a timely appeal to the Court of Special Appeals. The Court of Special Appeals, in an unreported opinion, reversed the decision of the Circuit Court for Baltimore County. *See Falls Rd. Cmty. Ass'n, et al. v. Arthur Becker, et al.*, No. 436, Sept. Term, 2020 (Md. Ct. Spec. App. Apr. 22, 2021). The intermediate appellate court determined that the Board correctly "recognized that the safety of the intersection was Commissioner Murphy's overriding concern[,]" and that this concern "could not be resolved simply by addressing two of [Commissioner Murphy's] 'general concepts[.]'" *Id.* at 29.

The Court of Special Appeals determined that Becker needed to provide substantial evidence "of the impact that the intersection will have on Falls Road based on empirical data" to establish the safety of the Falls Road and Peachwood Lane intersection. *Id.* Because the Court of Special Appeals concluded that Becker did not satisfy this burden, it reversed the judgment of the Circuit Court for Baltimore County, effectively reinstating the Board's decision that collateral estoppel barred the approval of the 2018 Development Plan. *Id.*

### G. *Petition for Writ of* Certiorari

Becker petitioned this Court for a writ of *certiorari*, which we granted on August 25, 2021. *Arthur Becker, et al. v. Falls Road Cmty. Ass'n, et al.*, 475 Md. 699 (2021).

Becker presented the Court with the following question—"[w]hether, in order for collateral estoppel to bar a subsequently filed development plan, it must be found that the two plans are identical."

We rephrase the question as whether the Board erred in reversing the ALJ's determination that substantial changes existed between the 2004 Development Plan and the 2018 Development Plan, and therefore the doctrine of collateral estoppel did not bar approval of the 2018 Development Plan.

For the following reasons, we answer that question in the affirmative and reverse the judgment of the Court of Special Appeals.

**ANALYSIS**

*A.      Standard of Review*

In reviewing a decision of an administrative agency, this Court does not review the decisions of the circuit court or of the Court of Special Appeals. *Broadway Servs., Inc. v. Comptroller*, 478 Md. 200, 214 (2022). Instead, this Court determines whether the administrative agency itself erred. *Id.* In doing so, this Court reviews an agency's decision "solely on the grounds relied upon by the agency." *Dep't of Health & Mental Hygiene v. Campbell*, 364 Md. 108, 123 (2001).

This Court "is limited to determining if there is substantial evidence in the record as a whole to support the agency's [factual] findings . . . and to determine if the administrative decision is premised upon an erroneous conclusion of law." *United Parcel Serv., Inc. v. People's Couns. for Balt. Cty.*, 336 Md. 569, 577 (1994). "Substantial evidence exists if 'a reasonable mind might accept [the evidence] as adequate to support a conclusion.'"

19

*Broadway Servs., Inc.*, 478 Md. at 214 (quoting *Ramsay, Scarlett & Co., Inc. v. Comptroller*, 302 Md. 825, 834 (1985)).

In this case, we must determine whether the Board erred in reversing the ALJ's determination that substantial changes existed between the 2004 Development Plan and the 2018 Development Plan, and therefore the doctrine of collateral estoppel did not bar the ALJ from considering the merits of the 2018 Development Plan. Although the Board's decision is the final administrative decision for purposes of our review, we must consider whether the Board correctly applied the applicable provisions of the Baltimore County Code ("BCC") when undertaking its review of the ALJ's decision.[5] Accordingly, it is

---

[5] Becker argued in its opening brief to the Court and at oral argument that the Court of Special Appeals erred in determining that the Board's decision, and not the ALJ's decision was the final administrative decision for purposes of judicial review. Becker highlights that, under the BCC, the Board is the body to which an aggrieved person may appeal an administrative law judge's final decision regarding a development plan. In connection with its review of an administrative law judge's decision, the Board is required to apply a deferential standard of review to determine whether the administrative law judge's decision was outside the scope of his or her statutory authority, contrary to the law, or not supported by substantial evidence. *See* BCC § 32-4-281(e).

Although Becker accurately outlines the scope of the Board's review under the applicable provisions of the BCC, the fact that the Board is undertaking an on the record deferential review does not alter its characterization as the County's final administrative decision for purposes of judicial review under Maryland Rule 7-201, *et seq*. This Court has frequently had the occasion to review the decisions of county boards of appeals, which affirmed or reversed the decision of an earlier decision maker, such as an administrative law judge or hearing officer. *See, e.g., People's Couns. of Balt. Cty. v. Surina*, 400 Md. 662, 681 (2007) (reviewing the decision of the Baltimore County Board of Appeals, which affirmed the decision of the hearing officer); *White v. North*, 356 Md. 31, 35 (1999) (reviewing for substantial evidence the decision of the Board of Appeals of Anne Arundel County, which reversed the decision of the hearing officer); *Sembly v. Cty. Bd. of Appeals of Balt. Cty.*, 269 Md. 177, 182–83 (1973) (reviewing the decision of the Baltimore County Board of Appeals, which reviewed on appeal the decision of the zoning commissioner).

20

instructive to set forth the County's review process for approving or denying development plans, and the Board's scope of review when an aggrieved party files an appeal from the decision of an administrative law judge.

**B.** ***Development Plan Review Under the Baltimore County Code***

1. *Proceedings Before an Administrative Law Judge*

BCC § 32-4-227 sets forth that a "final action on a Development Plan may not be taken until after a public quasi-judicial hearing before a Hearing Officer." BCC § 32-4-227(a). Subsection (c) establishes that the Department of Permits, Approvals and Inspections is responsible for compiling and maintaining the following "with respect to all hearing proceedings over which the Hearing Officer presides":

> (i) The Development Plan;
> (ii) Reports or comments or proposed or requested conditions relating to the plan from county agencies, the community input meeting, community groups, or any person;
> (iii) Exhibits introduced in evidence at the hearing;
> (iv) The final decision rendered by the Hearing Officer; and
> (v) Papers, records, and dockets required under §§ 32-3-106 and 32-3-109 of this article.

BCC § 32-4-227(c).

Additionally, "[t]he Hearing Officer shall consider any comments and conditions submitted by a county agency[.]" BCC § 32-4-227(e)(1). And, "[i]f no comments or conditions are received by the Hearing Officer, the Development Plan shall be considered to be in compliance with county regulations." BCC § 32-4-227(e)(2). BCC § 32-4-227

---

The final administrative decision related to the approval of the 2018 Development Plan is the Board's decision, not the ALJ's decision.

21

establishes that an administrative law judge, acting in a quasi-judicial capacity, has the authority to enter findings of fact and conclusions of law regarding a development plan following a public hearing on the matter.

2. *Appeals of an Administrative Law Judge's Decision to the Board of Appeals*

BCC § 32-4-281(b)(1) states that "[a] person aggrieved or feeling aggrieved by final action on a Development Plan may file a notice of appeal with the Board of Appeals . . . within 30 days after the date of the final decision of the Hearing Officer." BCC § 32-4-281(d) establishes that in reviewing an administrative law judge's final decision on a development plan, the Board shall hear oral argument of the parties and receive written briefs, if requested by either party. Additionally, "[a]t the Board's discretion, additional evidence and testimony may be allowed." BCC § 32-4-281(d).

BCC § 32-4-281(e) authorizes the Board to either remand the case to the Hearing Officer, affirm the decision of the Hearing Officer, or reverse/modify the decision of the Hearing Officer. The Board may reverse or modify the decision of the Hearing Officer where the Board determines that the decision:

1. Exceeds the statutory authority or jurisdiction of the Hearing Officer;
2. Results from an unlawful procedure;
3. Is affected by any other error of law;
*4. Is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or*
5. Is arbitrary or capricious.

BCC § 32-4-281(e) (Emphasis added).

Here, in the introductory language of its opinion, the Board identified that it was conducting an "on the record review," noting that "[t]he Protestants appealed only the

22

approval of the development plan; no appeal was taken from any of the zoning issues. As a result, the appeal hearing before the [Board] was on the record and not de novo." With the scope of the Board's review in mind, we turn to the issue of whether the Board correctly determined that the ALJ erred in concluding that substantial changes existed between the 2004 Development Plan and the 2018 Development Plan, and therefore the doctrine of collateral estoppel did not bar the ALJ's consideration and approval of the 2018 Development Plan.

## C. *Doctrine of Collateral Estoppel*

We begin our analysis of the Board's opinion with a review of this Court's precedent on collateral estoppel. In general, the law "precludes the relitigation of matters that have been fully and fairly litigated and finally decided between parties, by a tribunal of competent jurisdiction." *Murray Int'l Freight Corp. v. Graham*, 315 Md. 543, 547 (1989) ("*Murray Int'l*"). This avoids "the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibilities of inconsistent decisions." *Montana v. U.S.*, 440 U.S. 147, 153–54 (1979). Accordingly, rules have been developed and adopted to preserve the conclusive effect of judgments. *Murray Int'l*, 315 Md. at 547. The two leading doctrines that serve to preserve this conclusive effect are res judicata and collateral estoppel.[6]

---

[6] The doctrine of res judicata, also referred to as claim preclusion, provides that a claim may not be relitigated once it has come to a final judgment. This Court has previously explained the doctrine of res judicata as

> a judgment between the same parties and their privies is a final bar to any other suit upon the same cause of action, and is conclusive, not only as to all

The doctrine of collateral estoppel, also referred to as issue preclusion, establishes that factual issues resolved in the adjudication of one claim are binding for purposes of subsequent adjudication of another claim. *Welsh v. Gerber Prod., Inc.*, 315 Md. 510, 516 (1989). This Court has established a four-part test that must be satisfied for collateral estoppel to apply:

> 1. Was the issue decided in the prior adjudication identical with the one presented in the action in question?
>
> 2. Was there a final judgment on the merits?
>
> 3. Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?
>
> 4. Was the party against whom the plea is asserted given a fair opportunity to be heard on the issue?

*Burruss v. Bd. of Cty. Comm'rs of Frederick Cty.*, 427 Md. 231, 249–50 (2012) (citing

*Wash. Suburban Sanitary Comm'n v. TKU Assocs.*, 281 Md. 1, 18–19 (1977)).

---

> matters that have been decided in the original suit, but as to all matters which with propriety could have been litigated in the first suit[.]

*Alvey v. Alvey*, 225 Md. 386, 390 (1961).

Res judicata presents itself as an affirmative defense that will preclude the relitigation of a suit if: (1) the parties in the present litigation are the same or in privity with the parties to the earlier action; (2) the claim in the current action is identical to the one determined in the prior adjudication; and (3) there was a final judgment on the merits in the previous action. *Bank of New York Mellon v. Georg*, 456 Md. 616, 667 (2017) (quoting *Powell v. Breslin*, 430 Md. 52, 63–64 (2013)). The doctrine bars relitigation of "'all matters actually litigated or that could have been litigated[.]'" *Id.* at 667–68 (quoting *Colandrea v. Wilde Lake Cmty. Ass'n, Inc.*, 361 Md. 371, 388 (2000)).

The Court sanctioned the conclusive effect of collateral estoppel for an administrative agency's findings in *Batson v. Shiflett*, 325 Md. 684 (1992). In doing so, the Court adopted the "*Exxon* test" used by the Ninth Circuit with respect to administrative agency findings and collateral estoppel. *Batson*, 325 Md. at 701–03. Under this test, administrative agency findings are afforded the preclusive effect from collateral estoppel if: (1) the agency was operating in a judicial capacity; (2) the issue presented to the court was actually litigated by the agency; and (3) resolution of the issue was necessary to the agency's action. *Id*. at 701.

In development and zoning matters specifically, this Court has established that the threshold issue in determining if a prior adjudication regarding the same property should bear a preclusive effect on the present development plan or zoning application is whether significant or substantial changes exist between the prior development plan or zoning application and the present development plan or zoning application. *See Woodlawn Area Citizens Ass'n, Inc. v. Bd. of Cty. Comm'rs for Prince George's Cty.*, 241 Md. 187, 195–98 (1966) ("*Woodlawn Area*"). *Woodlawn Area* involved property owners attempting to rezone a forty-seven-acre tract of land in Prince George's County from its zoning status for detached single-family houses to garden apartments that would permit approximately eight hundred families to occupy the land. *Id*. at 189. The property owners attempted to rezone the land three times over a ten-year period. *Id*. at 189–90. The property owners' request was finally approved in 1964, which the protestants appealed, arguing that the prior denials of the rezoning request barred the approval because no substantial changes had been made to the rezoning application. *Id*. at 190.

25

The Court ultimately concluded that "[n]o substantial or significant change in fact or law was shown to have occurred between" the property owners' initial rezoning application and the approved application in 1964. *Woodlawn Area*, 241 Md. at 197. The property owners identified four changes in support of their argument that the rezoning application had been properly approved: (1) a proposed highway that would run along one side of the property if developed as garden apartments; (2) the land's suitability for single-family homes and garden apartment houses; (3) the local community's need for apartment houses; and (4) the eight zoning reclassifications of the land surrounding the property. *Id.* at 197–200. The Court discounted each of these alleged changes as considered in the initial disposition of the rezoning application. *Id.* Accordingly, the Court held that the original disposition barred the approval of the rezoning application. *Id.* at 201.

**D.** **Analysis of the Board's Opinion Reversing the ALJ's Approval of the 2018 Development Plan**

1. *Parties' Contentions*

Becker argues that the Board erred in determining that collateral estoppel precluded the ALJ from approving the 2018 Development Plan. Becker contends that the ALJ was presented with substantial evidence that significant and material changes existed between the 2004 Development Plan and the 2018 Development Plan, and therefore the ALJ properly determined that collateral estoppel did not preclude approving the 2018 Development Plan. Specifically, Becker identifies the following differences between the 2004 Development Plan and the 2018 Development Plan, which were presented to the ALJ: (1) the SHA's determination that the site distance requirements were satisfied for the Falls

26

Road intersection; (2) the change in the access road to a private driveway; and (3) the reduction of houses from ten to five. Additionally, Becker highlights that the same ALJ also presided over the hearing regarding the 2016 Development Plan, which he ultimately denied under the doctrine of collateral estoppel, demonstrating the extensive care and thought given to the issues.

The Community Association responds that the Board correctly concluded that collateral estoppel bars approving the 2018 Development Plan. The Community Association argues that collateral estoppel applies because the changes between the 2004 Development Plan and the 2018 Development Plan—reducing the number of lots from ten to five and changing the access road to a private driveway—are not substantial, and that Becker presented no evidence to demonstrate what the overall impact would be from these two changes.

Further, separate from these changes, the Community Association contends that collateral estoppel still bars approval of the 2018 Development Plan due to other, critical elements of the development plan that have not changed. The Community Association relies on three aspects of the 2018 Development Plan in support of this contention, which are that: (1) the access road to the development is still not aligned with Hickory Hill Road; (2) the intersection sight distance standard is still not satisfied; and (3) the confluence of other roads and driveways entering Falls Road remains. Finally, the Community Association highlights that Commissioner Murphy did not set forth a specific checklist requiring approval of an updated development plan and asserts that simply addressing two

27

of Commissioner Murphy's concerns regarding the 2004 Development Plan is not sufficient to obtain approval of the 2018 Development Plan.

2. *The Board's Conclusion Reversing the ALJ's Approval of the 2018 Development Plan*

The Board reversed the decision of the ALJ, concluding that substantial changes did not exist between the 2004 Development Plan and the 2018 Development Plan, and therefore collateral estoppel barred approving the 2018 Development Plan. As noted above, the Board did not receive additional evidence and conducted an on the record review of the ALJ's determination. BCC § 32-4-281(e) permits the Board to reverse an administrative law judge's decision where the decision "[i]s unsupported by competent, material, and substantial evidence in light of the entire record as submitted[.]"

Based upon our review of the record, we determine that the Board did not afford the ALJ's findings of fact sufficient deference. We conclude that there was competent, material and substantial evidence presented to the ALJ—as the fact finder—that significant changes *had* been made between the 2004 Development Plan and the 2018 Development Plan, and the ALJ correctly determined that the doctrine of collateral estoppel did not preclude his review and approval of the 2018 Development Plan.

In the evidentiary hearing before the ALJ, comments of all relevant County agencies, as well as the SHA, were included in the record establishing that the 2018 Development Plan complied with County regulations. Under BCC § 32-4-227(e), once the comments and conditions of the County agencies recommending approval were received into evidence, the burden of coming forward with evidence that the 2018 Development

28

Plan was not in compliance with the County regulations shifted to the Community Association. Becker also presented one expert witness, Mr. Sharon, who explained the differences between the 2004 Development Plan and the 2018 Development Plan. Notably, although the Community Association provided testimony of concerned community members, the Community Association did not provide any substantive evidence or testimony to rebut the testimony of Becker's expert witness. The Community Association chose to raise the defense of collateral estoppel and not introduce expert testimony challenging the safety of the access point on the merits or the efficacy of the changes from the 2004 Development Plan to the 2018 Development Plan.

Based upon the totality of the evidence presented, the ALJ concluded that the doctrine of collateral estoppel did not bar his consideration of the 2018 Development Plan, stating:

> Mr. Sharon opined the changes shown on the current plan are significant, and no evidence was presented to rebut his testimony. The current plan proposes five (5) new homes, while the 2004 plan proposed ten (10) lots. A 50% reduction in density is in my opinion—based upon the plain meaning of that term—a "substantial change." In addition, the access roadway is now proposed to be an existing private driveway, as opposed to the public road shown on the earlier plans.

It is apparent that the ALJ credited Mr. Sharon's expert testimony and agreed with the characterization that these changes were substantial. In summarizing and analyzing Mr. Sharon's testimony, the ALJ connected each change to Commissioner Murphy's broad recommendations as to what circumstances might result in the northern pod being approved. Comparing these changes to Commissioner Murphy's reasoning for denying the 2004 Development Plan, the ALJ commented that Commissioner Murphy "referenced

29

both of these issues in his 2004 order when discussing the circumstances under which the 'northern pod' might be approved, and thus he obviously considered these to be material or substantial issues." The ALJ also noted that "the 50% reduction in lots has allowed the Developer to provide stormwater management ("SWM") devices on each individual lot, which in my opinion also constitutes a material change from the previous plan which proposed a large SWM facility." Considering these changes in their totality—(1) the reduction in lots from ten to five, which is a fifty percent reduction in density; (2) the access roadway being a private driveway, as opposed to a public road; and (3) the stormwater management devices provided on each individual lot—the ALJ concluded that collateral estoppel did not bar his consideration of the 2018 Development Plan.

In connection with his discussion of the application of collateral estoppel, the ALJ specifically addressed the Community Association's concern over the safety of the Falls Road and Peachwood Lane intersection, and that "the change in circumstances must be a change in the particular circumstances that induced the denial." Concerning this argument, the ALJ stated:

> I believe the Developer satisfies this standard. [Commissioner] Murphy's denial of the northern pod in 2004 was based upon his belief [that] the intersection with Falls Road was unsafe. While he did not expressly state what changes needed to be made, he noted that: (1) the number of lots should be reduced; and (2) the access road should be private, so drivers are not [misled]. [Commissioner] Murphy expressly stated that "a large part of the problem (*i.e.*, an unsafe intersection) arises with the fact that Rose Court is to be a public road." He also held in 2004 [that] the northern pod was denied (in part) based on the proposed stormwater management system, which he ordered must be "revised" on any future plan submission. The current plan addresses and proposes changes in all of these areas, which "induced the prior denial."

30

(Internal references to exhibits omitted).

The ALJ recognized that the reduction in the number of lots and the designation of the access road as a private driveway were two conditions that Commissioner Murphy had specifically identified in deeming the intersection with Falls Road as unsafe. The ALJ acknowledged that two of Commissioner Murphy's fundamental concerns with the 2004 Development Plan had been sufficiently addressed in the 2018 Development Plan. Further, the ALJ highlighted that Commissioner Murphy had an additional concern regarding the stormwater management system. The ALJ also emphasized that because each lot now has its own individual stormwater management system, clearly Commissioner Murphy's concern had been addressed.

The ALJ concluded his analysis by comparing the 2018 Development Plan to the 2016 Development Plan. In comparing the two development plans, the opinion recognized that the 2016 Development Plan only contained one change from the 2004 Development Plan, i.e., the reduction in the number of lots to be developed. The ALJ explained that the changes in the 2018 Development Plan were "more numerous and substantial than the sole change proposed in the 2016 case[.]" As such, it is evident from this record that the ALJ thoughtfully analyzed the 2018 Development Plan in reaching his conclusion that substantial changes had been made since the 2004 Development Plan and that the proposed intersection was safe.

A review of the record reveals that the Board did not provide adequate deference to the factual findings and credibility determinations of the ALJ. The Board's role in reviewing the decision of the ALJ is to determine if the ALJ misapplied the law and if the

31

ALJ's conclusion is supported by sufficient evidence in the record. The Board may only reverse a final decision of an administrative law judge where the judgment is not supported by "competent, material, and substantial evidence[.]" BCC § 32-4-281(e).

The record here sufficiently demonstrates that the ALJ's determination that substantial changes existed between the 2004 Development Plan and the 2018 Development Plan is supported by competent, material, and substantial evidence, which the ALJ carefully considered in concluding that the doctrine of collateral estoppel did not preclude his consideration of the merits of the 2018 Development Plan. Accordingly, we determine that the Board erred in reversing the decision of the ALJ.

In sum, the present record demonstrates that specific changes were made to the 2018 Development Plan to address the initial concerns of Commissioner Murphy, and thus substantially differentiate the 2018 Development Plan from the 2004 Development Plan. It is apparent that the record contains substantial evidence in support of the ALJ's conclusion. Accordingly, the Board erred in concluding that collateral estoppel barred approval of the 2018 Development Plan.

## CONCLUSION

For the foregoing reasons, we hold that the Board erred in concluding that collateral estoppel barred the approval of the 2018 Development Plan. Therefore, we reverse the judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. COSTS TO BE PAID BY RESPONDENT.**

32

Circuit Court for Baltimore County
Case No. C-03-CV-19-002639
Argued: December 3, 2021

IN THE COURT OF APPEALS

OF MARYLAND

No. 24

September Term, 2021

_____

ARTHUR BECKER, ET AL.

v.

FALLS ROAD COMMUNITY
ASSOCIATION, ET AL.

_____

*Getty, C.J.,
*McDonald
Watts
Hotten
Booth
Biran
Gould,

JJ.

_____

Concurring and Dissenting Opinion
by McDonald, J., which Watts, J., joins.

_____

Filed: August 26, 2022

*Getty, C.J., and McDonald, J., now Senior Judges, participated in the hearing and conference of this case while active members of this Court. After being recalled pursuant to Maryland Constitution, Article IV, Section 3A, they also participated in the decision and adoption of this opinion.

I largely concur in in the Majority's well-written opinion, but disagree with its disposition of the case.

As the Majority Opinion recounts, the Administrative Law Judge ("ALJ") approved the development plan in essentially two steps: (1) he first determined that collateral estoppel did not foreclose approval; and (2) he then assessed the merits of the development plan. Majority slip op. at 11-14. The Falls Road Community Association then appealed that approval to the Board of Appeals, which reversed the ALJ on the issue of collateral estoppel. The Board of Appeals thus considered only the first issue addressed by the ALJ. There was no need for it to reach the second issue if approval was foreclosed by collateral estoppel and therefore the Board of Appeals never assessed the merits of the proposal. To paraphrase the Circuit Court judge in this case, the Board of Appeals got off the bus at the first bus stop and never made it to its destination further down the line. The dissenting member of the Board of Appeals, who agreed with the ALJ that collateral estoppel did not require that the plan be denied approval, did advance to the second issue and would have remanded for further fact-finding, particularly on safety issues. *See* Majority slip op. at 14-17.

This Court now agrees with the ALJ that collateral estoppel is not an obstacle to approval of the plan. But, instead of sending the case back to the Board of Appeals and instructing it to assess the ALJ's decision on the merits of the plan – something the Board of Appeals has not yet had occasion to do – the Majority Opinion simply reverses the Board of Appeals decision. Majority slip op. at 32. As Judge Hotten's dissent outlines, there are significant questions as to the ALJ's decision on the merits of the plan, particularly as to

safety issues, regardless of whether collateral estoppel applies.  *See* Dissenting Opinion of Judge Hotten at 13-20.  Yet neither this Court nor the Board of Appeals has reviewed the merits of the ALJ's decision on those issues.  And it is the Board of Appeals that should undertake that review in the first instance.

I do not disagree with the Court's decision on collateral estoppel.  In my view, however, the matter should be remanded to the Board of Appeals so that it may consider the ALJ's decision on the merits of the proposal and either agree with the ALJ, disagree with the ALJ, or (as the dissenting member of the Board had recommended) remand the matter to the ALJ for amplification of his findings and further fact-finding.  Any party aggrieved by the Board's decision on the merits can pursue judicial review as allowed by the relevant law.  Otherwise, this Court has truncated the review of the serious safety issues raised by the Community Association.  In that sense, this Court has also exited the bus before it reaches its destination.

Judge Watts has advised that she joins this opinion.

Circuit Court for Baltimore County
Case No. C-03-CV-19-002639
Argued: December 3, 2021

IN THE COURT OF APPEALS
OF MARYLAND

No. 24

September Term, 2021

_____

ARTHUR BECKER, ET AL.

v.

FALLS ROAD COMMUNITY
ASSOCIATION, ET AL.

_____

*Getty, C.J.,
*McDonald,
Watts,
Hotten,
Booth,
Biran,
Gould,

JJ.

_____

Dissenting Opinion by Hotten, J.

_____

Filed: August 26, 2022

*Getty, C.J. and McDonald, J., now Senior Judges, participated in the hearing and conference of this case while active members of this Court. After being recalled pursuant to Maryland Constitution, Article IV, Section 3A, they also participated in the decision and adoption of the opinion of this Court.

Respectfully, I dissent.  The majority opinion correctly acknowledges that this Court reviews the decision of the Board of Appeals, not the decision of the Administrative Law Judge ("ALJ").  Unlike the majority, I agree with the final agency decision of the Board of Appeals, and I would have determined that collateral estoppel should have barred the 2018 development plan because it presented the same issue of traffic safety that originally led to the denial of the 2004 development plan.  *See Cnty. Council of Prince George's Cnty. v. Zimmer Dev. Co.*, 444 Md. 90, 573, 120 A.3d 677, 727 (2015) ("The reviewing court may not substitute its judgment for that of the administrative agency.").  Accordingly, I would affirm the Court of Special Appeals.

The doctrine of collateral estoppel prevents a losing party from relitigating an issue of ultimate fact in a future lawsuit.  This doctrine arose from "the judicial policy that the losing litigant deserves no rematch after a defeat fairly suffered[,]" *Colandrea v. Wilde Lake Community Ass'n, Inc.*, 361 Md. 371, 391, 761 A.2d 899, 909 (2000), and seeks to "avoid the expense and vexation of multiple lawsuits, conserve judicial resources, and foster reliance on judicial action by minimizing the possibilities of inconsistent decisions." *Janes v. State*, 350 Md. 284, 295, 711 A.2d 1319, 1324 (1998).  Collateral estoppel does not apply in land use cases when the losing litigant demonstrates "a substantial change in facts and circumstances" that initially caused the adverse judgment.  *Whittle v. Bd. of Zoning Appeals of Baltimore Cnty.*, 211 Md. 36, 45, 125 A.2d 41, 46 (1956); *see also Hilltop Terrace Homeowner's Ass'n v. Island Cnty.*, 126 Wash. 2d 22, 32, 891 P.2d 29, 35 (1995) (en banc) ("A review of out-of-state cases shows that the majority view is that a second application for a similar proposal can be considered if there is a 'substantial change

in circumstances' or a 'material change' in the application or in conditions relevant to the application.") (citation and footnote omitted).

In 2004, the Becker family ("Petitioner") submitted a land use development plan to Baltimore County to convert their farm into a residential development ("the 2004 plan"). After a public hearing, including five days of testimony from affected residents, county officials, civil engineers, an ecologist, and two traffic engineers, the Deputy Zoning Commissioner of Baltimore County ("the Commissioner") denied the plan in part because the 2004 plan proposed an intersection with Falls Road that would create unsafe traffic conditions. The Commissioner found that the proposed intersection provided inadequate stopping distance, created an offset intersection design, and exacerbated congestion along the affected section of Falls Road. Petitioner unsuccessfully moved for reconsideration, and in 2015, submitted a revised proposal that reduced the number of lots on the northern half of the development from ten to eight. An administrative law judge ("ALJ") found that collateral estoppel barred the revised plan.[1]

Petitioner submitted a third development plan for the property in 2018 ("the 2018 plan") that reduced the number of lots from eight to five and changed the label of the development's entrance road from a "public road" to a "private driveway." An ALJ found that the 2018 plan provided a substantial change in the facts and circumstances with respect to traffic safety so that collateral estoppel did not apply. The Board of Appeals reversed

---

[1] Baltimore County amended its code after 2004. An ALJ now hears zoning cases.

2

and found these subsequent modifications failed to meet the threshold of "substantial" change.

Based on my review of the record and pertinent land use authority, I would have concluded that the 2018 plan failed to substantially address the traffic safety issues that initially caused the Commissioner to deny the 2004 plan. Reducing the number of homes in the development and changing the name of the entrance road did not affect the inadequate stopping distance of the intersection, the offset intersection design, and the difficulty of drivers navigating an already congested section of Falls Road. Therefore, the 2018 plan should have been barred by collateral estoppel.

***Any "substantial" change in fact and circumstance must address the underlying reason for the initial adverse judgment.***

The dispositive issue in this case is whether the 2018 plan demonstrated a "substantial change in facts and circumstances[]" to avoid the preclusive effect of collateral estoppel. *Woodlawn Ass'n Area Citizens v. Bd. of Cnty. Comm'rs for Prince George's Cnty.*, 241 Md. 187, 196, 216 A.2d 149, 154–55 (1965). Collateral estoppel applies to land development plans to avoid arbitrary decisions that "arrive at opposite conclusions on substantially the same state of facts and the same law." *Id.*, 216 A.2d at 155. "[W]here the facts are subject to changes which might reasonably lead to an opposite result from that arrived at in an earlier case, and if *there have been substantial changes* in facts and

circumstances between the first case and the second, the doctrine of [collateral estoppel][2] would not [apply.] . . .” *Whittle* 211 Md. at 45, 125 A.2d at 46 (1956) (emphasis added).

In *Whittle*, a developer submitted a permit for the construction of a funeral home along York Road to the Board of Zoning Appeals of Baltimore County. *Id.* at 38, 125 A.2d at 42. The Zoning Commissioner denied the permit, and the circuit court affirmed based on its determination that the commercial nature of the funeral home disrupted the residential character of the neighborhood and would have adversely affected nearby real estate values. *Id.* at 40, 125 A.2d at 43. The developer submitted a revised plan six years later asserting that subsequent commercial developments in the neighborhood substantially changed the circumstances of the proposal, so that collateral estoppel would not apply. *Id.* at 41, 125 A.2d at 44.

This Court disagreed on appeal and held that collateral estoppel precluded adjudication of the revised plan. This Court acknowledged that “[c]onsiderable commercial development had come into being on York Road in the [] intervening years,” *Woodlawn*, 241 Md. at 196, 216 A.2d at 155, including a new gas station and increased population, but none was shown to “have had any effect upon the residential character of the neighborhood where the protestants live.” *Whittle*, 211 Md. at 46, 125 A.3d at 46. A growing population and steady commercial development were both established in the first

---

[2] In *Whittle*, this Court used the term “*res judicata*,” which I have replaced with “collateral estoppel” for accuracy and consistency. *See Woodlawn*, 241 Md. at 211, 216 A.2d at 164 (Barnes, J., dissenting) (noting this Court in *Whittle* used the term “*res judicata*” to describe “not a *direct estoppel* but [] a *collateral estoppel of an adjudicated fact by judgment*[.] . . .”) (emphasis in original).

4

adjudication, and while testimony "was more detailed in the second case than in the first, [] the issue [of whether the funeral home would infringe on the residential character of the neighborhood] was the same . . . [and] in [the Court's] estimation [did not] show a materially different situation. . . ." *Id.*, 125 A.3d at 46. As this Court later observed in *Woodlawn*, *Whittle* demonstrated that a substantial change in facts and circumstances requires more than actual differences between an initial and subsequent land use proposal. *See Woodlawn*, 241 Md. at 197, 216 A.2d at 156. A party must establish that the facts in the record leading to the initial adverse decision are different in kind. *See id.* at 199, 216 A.2d at 157 ("the record offers no reason . . . why the properties would, if developed in actual use under their new classifications, have any real effect upon or make any real change in the character of the neighborhood as one of individual family homes.").

This rule that the record must demonstrate a substantial change in the facts and circumstances that lead to the initial adverse decision accords with the approach generally held by our sister jurisdictions. *See, e.g.*, *Calapai v. Zoning Bd. of Appeals of Village of Babylon*, 871 N.Y.S.2d 288, 57 A.D.3d 987 (N.Y. App. Div. 2008); *In re Dippolito*, 833 A.2d 336 (Pa. Commw. Ct. 2003); *Griswold v. City of Homer*, 34 P.3d 1280 (Alaska 2001); *Whelden v. Bd. of Cnty. Comm'rs of County of Adams*, 782 P.2d 853 (Colo. App. 1989); *Hasam Realty Corp. v. Dade County*, 486 So. 2d 9 (Fla. Dist. Ct. App. 1986); *Chicago Title and Trust Co. v. Cook County*, 457 N.E.2d 1326 (Ill. App. Ct. 1983); *Bois v. City of Manchester*, 113 N.H. 339, 306 A.2d 778 (1973); *Mott's Realty Corp. v. Town Plan and Zoning Comm'n of Town of Windsor*, 152 Conn. 535, 209 A.2d 179 (1965).

***There is not substantial evidence to support the findings of the ALJ that the circumstances leading to the denial of the 2004 development plan had changed.***

The ALJ found that the 2018 plan established a substantial change in facts and circumstances to avoid the preclusive effect of collateral estoppel because the 2018 plan reduced the number of homes from ten to five, and the label for the entrance road was changed from a "public road" to a "private driveway." The Board of Appeals disagreed in a 2-1 decision and found that the 2018 plan failed to provide "material" or "substantial" changes to the 2004 plan. In effect, the Board of Appeals determined that the decision of the hearing judge was "unsupported by competent, material, and substantial evidence in light of the entire record as submitted[.]" Baltimore County, Md., Code ("BCC") § 32-4-281(e). Without evidence of substantial change between the two plans, the Board of Appeals concluded that the 2018 plan was barred by collateral estoppel. The dissenting member would have remanded the case to the ALJ to further develop the factual basis for approving the 2018 plan.

While the majority acknowledges the Board of Appeals rendered the final decision in the matter, the majority looks through the decision of the Board of Appeals and pays deference to the findings of the ALJ because the Board of Appeals conducted an "on the record" review of the determination of the ALJ. "In reviewing an agency's fact findings, we apply a substantial evidence test, which is deferential to the agency's determinations." *Allmond v. Dep't. of Health and Mental Hygiene*, 448 Md. 592, 608, 141 A.3d 57, 66 (2016). Under the substantial evidence test, this Court must determine "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached."

6

*Gore Enter. Holdings, Inc. v. Comptroller of Treasury*, 437 Md. 492, 504, 87 A.3d 1263, 1269 (2014) (quoting *Frey v. Comptroller of Treasury*, 422 Md. 111, 137, 29 A.3d 475, 490 (2011)).

There was insufficient evidence in the record to support the findings of the ALJ that a substantial change in circumstances occurred between the 2004 plan and 2018 plan. A "reasoning mind" would have not concluded that reducing the number of homes and relabeling the entrance road in the 2018 plan constituted a substantial change in circumstances because neither of these modifications "show a materially different situation" with respect to the traffic safety concerns in the 2004 plan identified by the Commissioner. Similar to how increased population and commercialization did not alter a funeral home's effect on the residential character of a neighborhood in *Whittle*, reducing the number of homes and relabeling the entrance road did not alter the traffic safety concerns arising from the design and placement of the proposed intersection.

In 2005, the Commissioner "found the proposed intersection unsafe[]" based on three factors. First, traffic engineer experts from opposing parties both found the sight distance for the entrance road to be inadequate. Second, the entrance road was "neither aligned with nor far enough away from Hickory Hill Road[.]" The "offset" alignment with Hickory Hill Road created an irregular sized intersection, which could lead drivers to pay insufficient attention to fast-moving traffic on Falls Road. Third, the entrance road exacerbated an already congested stretch of Falls Road with several roads and driveways in close proximity leading to a "mad and dangerous scramble" for drivers.

7

The decreased housing density in the 2018 plan may, at most, affect the number of cars using the private driveway, but it cannot substantially address any of the traffic safety concerns articulated by the Commissioner. Any *single* car would still be subject to inadequate stopping distance as described by the traffic engineer experts from both parties. Any *single* car entering or leaving the proposed development would still need to contend with the "mad and dangerous scramble" of turning onto Falls Road, in which traffic operates at an approximate average speed of 40 m.p.h. Any *single* car would still present a safety concern to the ever-increasing volume of traffic traveling along Falls Road which, based on the nearby aggregation of side roads and driveways, still do "not have the additional distance to avoid accidents with vehicles coming from the side roads." A reasoning mind also would not conclude that decreased housing density would have any effect on the unsafe offset intersection alignment between the entrance roadway and Hickory Hill Road.

The other change alleged change in circumstances between the two plans—formally relabeling the entrance route from a public road to a private driveway—cannot address the traffic safety concerns found by the Commissioner. The nomenclature used to describe the entrance road has no bearing on the inadequate stopping distance. The traffic engineers measured the distance and angle of the entrance road against the American Association of State Highway Transportation Officials (ASSHTO) standards of road safety, and the Commissioner found that because [Petitioner] "own[ed] so little frontage on Falls Road that he cannot himself guarantee clear sight distance to the south, no matter what standard is used." A reasoning mind would conclude that merely changing the name of the entrance

8

road would not and cannot substantially improve quantitative deficiencies in stopping distance.

The relabeled entrance road, like the decrease in housing density, cannot affect the dangerous offset of the intersection. The Commissioner observed that "driver expectation plays a large role in determining whether in practice an intersection will be safe." A "public road" could lead drivers to "not pay attention to other drivers" trying to turn onto Falls Road. Therefore, the Commissioner was "convinced that drivers using Rose Court [*i.e.*, the entrance road] would expect a 'normal' intersection by the physical amenities of a public road with a public road. [The Commissioner] also f[oun]d that they will be disappointed and unduly endangered by the proposed intersection." There is no evidence in the record that relabeling the public road as a private driveway in the 2018 plan would have any material effect on the expectations of the drivers because the design and placement of the road remained "*identically the same*[.]" (Emphasis added). If the Commissioner feared the physical amenities of the public road in the 2004 plan would cause drivers to unsafely enter Falls Road, then the unchanged physical amenities of the private road in the 2018 plan should present similar traffic safety concerns.

Finally, and no matter how the entrance road is labeled, it cannot alleviate the dangerous effect of "drivers frustrated by having to wait for Falls Road traffic coming out of Applecroft, Rose Court, Hickory Hill and the Jones driveway in a mad and dangerous scramble to accelerate onto Falls Road." Despite relabeling the public road as a private

drive, the *design* and *placement* of the entrance road along an already congested section of Falls Road remained unchanged.[3]

Similar to the land use proposal that presented insufficient change in circumstances in *Whittle*, the 2018 plan made distinct changes to the 2004 plan, but it failed to establish *substantially* different circumstances with respect to traffic safety. The sight distance remained inadequate. The intersection remained offset, and the affected stretch of Falls Road remained congested with nearby roads, driveways and fast-moving of traffic. A reasoning mind would not conclude that the proposed intersection with Falls Road in the 2018 plan was substantially safer than the intersection proposed in the 2005 plan. Therefore, the 2018 plan should have been barred by collateral estoppel.

---

[3] In *Mills v. Town Plan and Zoning Comm'n of Town of Windsor*, developers sought the development of a local shopping area and petitioned the local zoning board to rezone the property from agriculture to business. 145 Conn. 237, 239, 140 A.2d 871, 873 (1958). The zoning board unanimously voted to deny the petition because the property was subject to flooding and the nearby land was already sufficiently zoned for business. *Id.*, 140 A.2d at 873. The developers repetitioned the zoning board and submitted a plot plan that changed the location of one of the wings of the building, decreased the space for parking, and changed the name of the business from a local shopping center to "*regional* shopping center[.]" *Id.* at 242, 140 A.2d at 874 (emphasis added). The Court held that merely redesignating the property "regional shopping center" and moving the location of the property could not permit a second petition to the zoning board because neither of these changes substantially addressed the original reasons for denying the petition for rezoning.

The reasoning in *Mills* is analogous to the case at bar. Similar to how changing the name of a shopping center from local to regional did not substantially change flooding conditions and the prevalence of preexisting business zoning in *Mills*, changing the name of the proposed road did not substantially change the traffic safety conditions of the irregular intersection with Falls Road.

***Implementing the Commissioner's general concepts did not establish a substantial
change in circumstances.***

The Board of Appeals correctly downplayed the relevance of the Commissioner's
"general concepts" because a reasoning mind would not treat these concepts as dispositive
criteria for determining a substantial change in circumstance when the Commissioner
expressly repudiated overreliance on the "general concepts" in subsequent proposals. In
2005, after the Commissioner found the proposed intersection to be unsafe, he stated that
he "cannot provide some exact criteria under which [he] will approve the northern pod."
The Commissioner then suggested two "general concepts[:] . . . Rose Court should not be
a public road . . . [and] [t]he number of lots should be reduced to that number allowed to
be developed using a private driveway."

As a preliminary issue, these general concepts were dicta because they were
"unnecessary to the decision in the case. . . ." *Plank v. Cherneski*, 469 Md. 548, 594, 231
A.3d 436, 463 (2020) (citation omitted). The Commissioner placed the general concepts
at the end of the decision following the conclusion that the proposed intersection was
unsafe. In particular, the Commissioner never indicated that the proposal would have been
granted had Petitioner implemented these general concepts. These general concepts were
unnecessary to the decision in the case because they are irrelevant to collateral estoppel
analysis. *Shader v. Hampton Imp. Ass'n, Inc.*, 443 Md. 148, 162, 115 A.3d 185, 193 (2015)
(noting "[f]or the doctrine of collateral estoppel to apply," the reviewing court must
scrutinize "facts *necessary* to resolve the pertinent issues [that] were adjudicated in that
action[]") (emphasis added).

11

Implementing the general concepts did not address the substantive traffic safety concerns of the 2004 plan. The Board of Appeals correctly observed that the 50% decrease in lots, without more, provided no indication on whether it improved the traffic safety conditions of the development: "It is sometimes easy to mistake the number or type of changes with changes that are actually meaningful."[4] There is no indication in the record why this decrease had any material impact on the traffic safety concerns caused by the design and placement of the proposed intersection. There were neither findings nor analysis that explained why relabeling the public road as a private road would improve traffic safety conditions. The record contained "no testimony, expert or otherwise[] to [the ALJ] as to **why** the change to private lane materially enhanced the safety of the intersection." (Emphasis in original). The only evidence in the record indicated that relabeling the road would have *no* material effect on the design of the intersection: "[I]t is correct that Baltimore County will have to design private roads *to the same standards* as public roads both in construction and design items, as an example, with vertical horizontal curves and layout." (Emphasis added).

The majority correctly observes that the ALJ likely credited testimony of Petitioner's expert witness. While I agree with the majority that the ALJ heard and likely

---

[4] The Board of Appeals astutely observed that percentage change can be misleading. *See* Mark Twain, *Chapters from My Autobiography*, NORTH AMERICAN REVIEW (Sep. 7, 1906), https://www.gutenberg.org/files/19987/19987.txt, archived at https://perma.cc/43LS-VB79 ("There are three kinds of lies: lies, damned lies, and statistics."). If there had only been two lots in the 2004 plan, and the 2018 plan reduced the number of lots to one, a 50% decrease would have occurred, *but* presented the same question of whether this decrease had any material effect on the traffic safety conditions.

deemed credible uncontradicted expert witness testimony which described "significant changes made" to the 2018 plan, this credible testimony was still insufficient in establishing a substantial change in the traffic safety conditions which led the Commissioner to deny the 2004 plan. The expert opined two changes constituted substantial change: reduction in homes and redesignation of the road from a public road to private driveway. As explained above, neither of these changes substantively address the traffic safety issues that lead to the initial denial of the 2004 plan because neither of these changes can affect the underlying concerns with stopping distance and a congested, offset intersection. The ALJ found that "no evidence was presented to rebut [the expert] testimony[,]" but the burden was on Petitioner to establish that a substantial change had occurred.

A reasoning mind would not conclude that reducing the density of homes and relabeling the road materially addressed the inadequate stopping distance, the offset intersection design, and the congestion and traffic speed on Falls Road; therefore, implementing the "general concepts" did not constitute a substantial change in circumstances between the 2004 and 2018 plans. On this basis alone, collateral estoppel should have applied.

***Reversing the decision of the Board of Appeals and adopting the legal conclusions of the ALJ would conflict with state and local law.***

By overturning the decision of the Board of Appeals, the Majority has adopted the legal conclusions of the ALJ, which conflict with state and local law. Legal conclusions that conflict with state or local statutes and regulations are erroneous and subject to

13

reversal. *See Lawson v. Bowie State Univ.*, 421 Md. 245, 264, 26 A.3d 866, 877 (2011) (finding that the ALJ's conclusion was "inconsistent with the nature of the [pertinent] statute[.] . . ."). As this Court explained in *Lawson*, an erroneous application of authority may also lead to erroneous findings of fact. *Id.*, 264 A.3d at 877 (noting that the use of an improper standard undermined the ALJ's findings).

The ALJ erred by concluding that the Maryland State Highway Administration ("SHA") *exclusively* determines the traffic safety of the proposed intersection. When assessing the safety of the intersection, the ALJ stated, "[i]t is the SHA, not the ALJ or Baltimore County, which determines whether the proposed access is safe and satisfies State requirements, and thus I do not believe the plan can be denied on this basis." The ALJ did not provide authority for this proposition.[5] The SHA has jurisdiction over state roads and highways, but this jurisdiction does not eliminate the need for parties to comply with local traffic safety measures and regulations. *See, e.g.*, BCC § 3-2-1406(a)(2) ("All plans and specifications for a public improvement shall be submitted to the Director and shall be subject to the Director's approval.").

The legal conclusion that "[i]t is . . . not . . . Baltimore County[] which determines whether the proposed access is safe" inaccurately ignores traffic safety requirements of Baltimore County. New developments in Baltimore County *must* abide by Baltimore

---

[5] The ALJ seemingly contradicted this point in the following sentence: "The [Baltimore County Code] provides that the 'Hearing Officer shall grant approval of a development plan that complies with these development regulations applicable policies, rules and regulations.'" (Citation omitted).

14

County rules and regulations before receiving a permit for development. *See generally* BCC, art. 32.

While new developments in Baltimore County that impact State roads, such as Falls Road, must comply with State rules and regulations, a developer must *also* satisfy Baltimore County requirements. The record includes a letter from the Baltimore County Bureau of Development Plans Review explaining as such: "Falls Road, Maryland Route 25, is a state road. All improvements, intersections, entrances, drainage requirements and construction affecting a state road right-of-way are subject to the standards, specifications and approval of the Maryland State Highway Administration *in addition to those of Baltimore County.*" (Emphasis added and removed). County officials expressly affirmed that the construction of a "*private road*[] shall be designed and constructed to the *Department of Public Works* standards and specifications[,] . . . [and] shall be inspected and certified to the *Baltimore County Bureau of Engineering and Construction* by the Developer's engineer." (Emphasis in original). *See* Baltimore County Department of Permits, Approvals and Inspections, *Development Plans Review* (last visited Jun. 9, 2022), https://resources.baltimorecountymd.gov/Documents/Permits/devplanrev1.pdf, archived at https://perma.cc/S3Z9-ZYL8 ("Baltimore County is responsible for the review and approval of construction documents for development projects to ensure *compliance with County Code and State law requirements*.") (emphasis added).[6]

---

[6] The statements in the record from Baltimore County officials, corroborated by official policy documents available publicly online, contradict the statements made by Respondent's expert witness:

(continued . . .)

15

The Baltimore County Bureau of Development Plans Review Policy Manual

("Manual") was included in the record and addressed by both parties. The manual defines

private roads as the following:

> Those which are designed and constructed *to Department of Public Works standards and specifications, but which are inspected and certified to the Bureau of Development Plans Review* by the developer's engineer (P.E.) and are retained for ownership and maintenance by a single entity, company, or corporations, within an unsubdivided lot, parcel, or tract.

Manual at p. 6. (emphasis added). The 2018 plan must comply with the standards and

specifications of the Baltimore County Department of Public Works.

The ALJ suggested that the Manual was not binding on the parties based on the

appearance of discretionary language: "The following [traffic engineering] items are

intended as general guidelines and may be recommended to be waived or made more

---

(. . . continued)

> [Counsel for Respondent]: Does Baltimore County play a role in the approval or the access to a State road?
>
> [Expert witness for Respondent]: No, they do not.
>
> [Counsel for Respondent]: Okay. Has, [] the State given their decision on the access to their road, Falls Road?
>
> [Expert witness for Respondent]: Yes, they have.

At a minimum, the testimony from the expert witness, even if credible, was misleading because it suggested that the SHA exclusively determined whether the 2018 plan presented safe traffic conditions, and that the SHA *had* determined that the 2018 plan presented safe traffic conditions. The SHA had *not* determined that the traffic conditions of the 2018 plan were safe, *see infra* slip. op. at 18, but even if the SHA had deemed 2018 plan to be safe, it would not be dispositive in establishing whether there was a substantial change in facts and circumstances.

16

stringent by the Director of the Department of Public Works as found to be reasonable for traffic safety or traffic operations." This discretionary language provides flexibility to the Department of Public Works in *assessing* whether a party has complied with traffic standards promulgated by Department of Public Works. It is the Department of Public Works, not parties themselves that determines whether deviation from the guidelines is warranted.

The ALJ also erroneously concluded that the Manual permitted intersections with less than 100 feet distance between roads. According to the Manual: "Where possible, the distance between public or private street intersections shall be at least 100 feet[.] . . . However, *sight distance or traffic operation considerations may take precedence*." (Emphasis added). The insufficient frontage on Petitioner's property made it impossible for the intersection to be at least 100 feet. The ALJ found that the permissive language, "[w]here possible," permitted developers to disregard the 100 feet requirement in the Manual. The ALJ failed to consider the next sentence advising developers of other criteria besides distance between roads: "sight distance or traffic operation considerations may take precedence." *See Whiting-Turner Contracting Co. v. Fitzpatrick*, 366 Md. 295, 303, 783 A.2d 667, 671 (2001) ("[S]tatutes on the same subject are to be read together and harmonized to the extent possible, reading them so as to avoid rendering either of them, or 'any portion, meaningless, surplusage, superfluous or nugatory.'") (citation omitted).

The proposed intersection with Falls Road did not merely lack sufficient frontage to comply with the Manual, it lacked sufficient sight distance, created an offset intersection, and exacerbated an already congested stretch of Falls Road. The ALJ failed to consider

17

how inadequate intersection distance would be compounded by inadequate sight distance and other complicating traffic operation considerations.

By erroneously discounting Baltimore County traffic safety standards, the ALJ minimized the objective criteria used by the Commissioner in finding the 2004 proposal to be unsafe. The ALJ substituted in its place the general concepts added by the Commissioner as dicta "akin to moving the goal posts after the game has begun." *Shannon v. State*, 468 Md. 322, 326, 227 A.3d 220, 222 (2020). Therefore, the ALJ overestimated the extent of substantive change between the two proposals and underestimated the unaddressed traffic safety concerns articulated by the Commissioner.[7]

Assuming, *arguendo*, that the SHA exclusively determined the traffic safety of the proposed development, the record does not support the conclusion of the ALJ that the SHA found the 2018 plan to be safe. A 2016 letter from the SHA suggested a safe intersection *could* be achieved, not that traffic safety of the intersection *had* been achieved. The weight of evidence in the record indicated that the SHA found the proposed intersection to be unsafe.[8] In March 2003, the SHA reviewed the proposed intersection and did not find it safe:

---

[7] Whether officials from Baltimore County approved the 2018 plan does not affect the collateral estoppel analysis in the instant case. The Commissioner found the 2004 plan unsafe notwithstanding Baltimore County approval. Renewed approval of the 2018 plan by Baltimore County officials did not demonstrate that the unsafe traffic conditions improved in any substantive manner.

[8] The dissent in the Board of Appeals decision also disputed the finding of the ALJ that the 2016 SHA letter "may be dispositive of the traffic and safety issues." The dissent criticized how the decision of the ALJ discounted "[c]ounty standards . . . [o]therwise, the

(continued . . . )

18

> We have reviewed the referenced concept plan and *do not recommend approval*. The proposed entrance is *located on a sub-standard section of MD 25*. Due to the physical constraints of this roadway section, should we allow an access point, the following roadway improvements will be the minimum required: . . . *We would strongly recommend that the developer evaluate alternative access to MD 25, such as, Applecroft Lane due to the existing roadway conditions*.

(Emphasis added).

> On December 4, 2015, the SHA reiterated its safety concerns:

> The SHA has concerns that adequate sight distance may not be achievable at the existing entrance location on MD 25. A sight distance profile must be submitted demonstrating that adequate sight distance for a 40MPH roadway can be achieved at the proposed entrance before were provide specific comments regarding the required entrance and road improvements.

> Finally, the SHA letter dated January 22, 2016, and cited by the ALJ, did not state

that the prior safety concerns have been remedied, rather the SHA suggested the proposed

intersection necessitated further review: "The design engineer has provided the requested

sight distance evaluation which demonstrates that the minimum required sight distance *can*

*be achieved* at the entrance location MD 25. *In continuation of the SHA's review . . . .*"

(Emphasis added). As the Board of Appeals observed, the SHA then listed "a lengthy set

of criteria that must be met in order to actually receive a permit."

---

(. . . continued)

County would not need to consider the [Manual] for any proposed intersection with a state road." The dissent also identified that the safety impact of moving the intersection distance from Hickory Hill Road, from 38 feet to 50 feet, was not established in the record. While the dissent acknowledged the 2018 plan likely improved traffic safety, the present record could not demonstrate whether the 2018 proposal *substantially* improved traffic safety.

The SHA letters did not provide evidence in support of the proposition that the underlying traffic safety concerns of the Commissioner had been remedied. The SHA suggested that proposed intersection *could* pass inspection, but this speculative endorsement mirrors the Commissioner's original denial of the proposal: "I **DO NOT APPROVE** the northern pod *but will allow the developer to submit revised designs, which provide a safe intersection if any driveway*, which serves the pod and Falls Road . . . ." (Emphasis in italics added and bold text in original).

Reliance on the shifting and ambiguous statements in the SHA undermines the purpose of collateral estoppel to avoid arbitrary decisions. The 2003 letter found the proposed intersection unsafe and recommended an *alternate* access route to avoid traffic safety concerns. The 2016 letter found that the intersection *could* be safe. Meanwhile, the underlying design flaws of the intersection and the "sub-standard section of [Falls Road]" remained unchanged. Without an explanation from the SHA regarding the intricacies of the agency's shifting positions, the letters appear contradictory. It defeats the judicial policies of efficiency and fairness underlying collateral estoppel to rely, even in part, on these letters because it encourages "losing litigants" to seek "rematches" predicated on inconclusive changes in circumstances. The ALJ erroneously concluded that the SHA determined that the proposed intersection was safe.

### The 2018 Plan should have been barred by collateral estoppel.

Without substantial evidence to support the ALJ's findings and conclusions that there was substantial change between the development plans, the 2018 plan should have been barred by collateral estoppel. While the 2018 plan presented non-trivial

20

modifications, namely the reduction in housing density and the relabeling of the entrance way from a public road to a private driveway, these modifications were insufficient as a matter of law to establish a substantial change in the facts and circumstances leading to the initial denial of the proposal for traffic safety concerns. Approving the plan now injects a dimension of arbitrariness into land development adjudications, both in terms of obtaining disparate results upon an identical issue and in terms of compliance with county and state regulations. *The Chatham Corp. v. Beltram*, 243 Md. 138, 151–52, 220 A.2d 589, 597 (1966) ("The ability to reconsider and change one's mind is, in most aspects of human endeavor, a virtue more often than a vice. In matters such as this, however, it risks the danger of being labelled capricious.").

Therefore, I would have affirmed the judgment of the Court of Special Appeals. Respectfully, I dissent.

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/coa/24a21cn.pdf

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/coa/24a21cn2.pdf